UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| NATIVE AMERICAN COUNCIL OF TRIBES, BLAINE BRINGS PLENTY, BRIAN DUBRAY, and CLAYTON CREEK, | ) ) ) ) ) | Civ.  09-4182-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| DOUGLAS WEBER, Warden of the South Dakota State Penitentiary, TIMOTHY REISCH, Secretary of the Department of Corrections, and MARTY JACKLEY, Attorney General, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs, Native American Council of Tribes, Blaine Brings Plenty,

Brian Dubray, and Clayton Creek (collectively plaintiffs), brought suit

against defendants, Douglas Weber, Timothy Reisch, and Marty Jackley

(collectively defendants), alleging violations of the Religious Land Use and

Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, the First

Amendment, the Fourteenth Amendment, the American Indian Religious

Freedom Act, 42 U.S.C. § 1996, and various international laws. Defendants

move for summary judgment. Only Clayton Creek has filed a brief in

opposition to the summary judgment motion. Defendants' motion for summary judgment is granted in part and denied in part.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted). The nonmoving party also receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

2

## BACKGROUND

The pertinent facts to this order, in the light most favorable to plaintiffs, the nonmoving party, are as follows:

Plaintiffs are Native American inmates at penal institutions managed by the South Dakota Department of Corrections (DOC). Plaintiffs use a mixture of tobacco (also known as cunli) and other botanicals, such as cansasa (the inner bark of the red twig dogwood), sage, bitter root, bearberry, lovage, flat cedar, sweet grass, etc., in religious ceremonies, such as pipe, tie, and flag ceremonies.

Before November 19, 1992, defendants allowed smoking on land owned, leased, or occupied by the DOC. But on November 19, 1992, pursuant to Executive Order 92-10, defendants prohibited smoking on all land and buildings owned, leased, or occupied by the DOC. On December 17, 1998, Weber announced a new policy that banned tobacco for all DOC inmates. In 2000, the DOC and its facilities became completely tobacco free.

Native American inmates who use tobacco for religious ceremonies were exempted from the no tobacco policies. Defendants allowed Native American inmates to continue using tobacco in the tobacco/botanical mixture, but inmates were prohibited from taking any tobacco out of the mixture. Some inmates who participated in the Native American religious

3

ceremonies abused the tobacco policy by separating the tobacco from the tobacco/botanical mixture and selling or bartering the tobacco within the general prison population. To address this misuse of tobacco, defendants decreased the proportion of tobacco in the tobacco/botanical mixture from 50 percent tobacco and 50 percent botanicals to 25 percent tobacco and 75 percent botanicals. Plaintiffs do not argue that the July 2005 change infringed on the exercise of their religious beliefs.

On September 17, 2009, Mary Montoya, a volunteer religious services organizer for the DOC, attended a meeting between Medicine Man Sidney Has No Horses from the Pine Ridge Indian Reservation and Native American inmates. Defendants allege that during the meeting, Has No Horses told the inmates that they should not use commercial tobacco in their pipes. The only documentation from this meeting are Montoya's meeting notes. Docket 81-1 at 11-12.

On September 19, 2009, Has No Horses met with the pipe carriers during a powwow at the South Dakota State Penitentiary. Even though Montoya did not attend that meeting, she recorded varying accounts of what people told her transpired during the meeting. Inmate Leonard Blue Thunder told her that Has No Horses did not back down from his position that commercial tobacco should be removed from the pipes. Brings Plenty explained to her that Has No Horses told them that every inmate should

4

make his own choice about what he should smoke in his pipe. Alcohol counselor Willard Dathe told Montoya that the pipe carriers who left the meeting had angry body language. Montoya did not inquire with Has No Horses about what he told the inmates during the meeting. *See* Docket 81-1 at 12 (describing the September 19 meeting).

Montoya's notes also state that "[o]ther medicine men have strongly suggested to the inmates that they quit using cunli," but Has No Horses's discussion "was the first time I heard a medicine man say he was removing it from the prisons." Docket 81-1 at 12. According to Montoya's own notes, however, she, not Has No Horses, removed the tobacco: "To honor Sidney's request that cunli not be used in mixtures, Bud Johnston and I have removed it from the mixture we use for pipe ceremonies at the Minnehaha County Jail on Thursday mornings." Docket 81-1 at 12. According to Montoya's notes from October 1, 2009, at least one Native American inmate from the Yankton Sioux Tribe questioned the removal of tobacco from the pipe mixture. Docket 81-1 at 14.

A letter dated November 10, 2009, from Richard Two Dogs states that he supports "Mr. Roy Stone (Wakan Iyeska) of the Sicangu Nation in his decision to ban all commercial tobacco from all Lakota Ceremonies in the South Dakota penal system. Because of the devastating effects of commercial tobacco to the native american people I stand with Mr. Roy

Stone." Docket 81-1 at 13. It is unclear from the record who Richard Two Dogs is and whether he is affiliated with the Native American religion.

Bud Johnston, president of a Native American church in Pipestone, Minnesota, assists Montoya in the pipe ceremonies led at the Minnehaha County Jail. Johnston also supports removing tobacco from the pipe mixture and using a red willow blend and that "[i]nmates who really know about their culture will have no problem with this and the others who just wanted a smoke will just go away." Docket 81-1 at 15.

On October 19, 2009, Jennifer Wagner, the Penitentiary's Cultural Activities Coordinator at the time, sent an email to DOC officials notifying them that tobacco would no longer be allowed in Native American religious ceremonies. She also instructed officials on how to handle complaints: "When inmates come to you to complain, please remind them that we are honoring the request of the respected Medicine Men and are going back to their traditional ways." Docket 81-1 at 19. Attached to Wagner's email was a letter from Weber, which stated that tobacco would be removed from the tobacco/botanical mixture to respect the wishes of the Medicine Men and Spiritual Leaders. Docket 81-1 at 20.

Plaintiffs protest defendants' October 2009 policy and argue that the use of tobacco in their religious ceremonies is a long-standing religious

tradition. They seek injunctive relief to require defendants to allow them to use tobacco in their religious ceremonies.

## DISCUSSION

## I.  Religious Land Use and Institutionalized Persons Act

Plaintiffs allege that defendants violated their rights under RLUIPA. Section three of RLUIPA protects inmates' religious exercises from undue government interference:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000cc-1(a)(1)-(2). Section three protects inmates' religious exercises "when the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b). The parties do not dispute that RLUIPA applies to DOC facilities and South Dakota state governmental officers. *See also Sossamon v. Tex.*, 131 S. Ct. 1651, 1656 (2011) (reasoning that for purposes of § 3, " 'government' includes, *inter alia*, States, counties, municipalities, their instrumentalities and officers, and person acting under color of state law." (citing § 2000cc-5(4)(A))).

7

"To make out a prima facie RLUIPA claim against a state official, an inmate 'must show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion.' " *Van Wyhe v. Reisch*, 581 F.3d 639, 654 (8th Cir. 2009) (quoting *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009)). If the inmate meets this prima facie showing, "then the government bears the burden of persuasion on every other element of the claim." *Id.* (citing § 2000cc-2(b)).

## A.    Substantial Burden on the Exercise of Religion

The Eighth Circuit Court of Appeals has announced various ways for an inmate to make RLUIPA's threshold showing:

> [T]o demonstrate a substantial burden on the exercise of religion, a government policy or action "must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Van Wyhe*, 581 F.3d at 649 (alterations in original) (quoting *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 n.7 (8th Cir. 2008)). RLUIPA defines "religious exercise" as "including the exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-

5(7)(A); *see also Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 832 (8th Cir. 2009) (same).[1]

An inmate must present some evidence to show that there is a substantial burden on his ability to exercise his religion. *Patel*, 515 F.3d at 814 (reasoning that the inmate could not meet his threshold showing because he offered only a "single, vague and unsupported statement" and "the record offer[ed] no evidence" regarding the inmate's claims). But whether an inmate "can establish the truth or sincerity of [his] belief is a matter to be decided at trial . . . ." *Van Wyhe*, 581 F.3d at 656. If an inmate asserts beliefs or aspects of his faith that may be substantially burdened by the prison's regulations, a trial is usually warranted. *See, e.g.*, *Murphy*, 372 F.3d at 988 ("Whether Murphy can establish the truth of [his] allegations and the existence of a substantial burden on the exercise of his religion is a matter to be determined by the district court in the first instance following a trial on the merits on this issue.").

---

[1] Defendants, citing *Murphy v. Missouri Department of Corrections*, 372 F.3d 979 (8th Cir. 2004), argue that plaintiffs must show that defendants' policy substantially burdens a central tenet of their religious beliefs. Docket 86 at 6 (citing *Murphy*, 372 F.3d at 988 (reasoning that "government policy or actions must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs . . . ." (alterations in original) (citations omitted))). But the Eighth Circuit has abrogated the "central tenet" portion of the test and extended the test to "religious practices that are not 'compelled by, or central to' a certain belief system." *Van Wyhe*, 581 F.3d at 649 (quoting *Patel*, 515 F.3d at 813 n.7).

The parties present two varying accounts of plaintiffs' religious beliefs. Plaintiffs argue that tobacco has been "natural and central to their religious ceremonies since time immemorial . . . ." Docket 102 at 3. Plaintiffs argue that defendants, without consulting plaintiffs, took tobacco away from their religious ceremonies. Docket 102 at 6.

Defendants argue that tobacco is not a part of plaintiffs' religious beliefs. According to Montoya's notes, Medicine Man Has No Horses told inmates during a September 17, 2009, meeting at the Penitentiary that tobacco was not traditionally used in the pipe ceremonies. On September 19, 2009, Has No Horses met with the pipe carriers during a powwow at the Penitentiary and discussed the use of tobacco in religious ceremonies. But Montoya's notes reflect varying accounts of what occurred during the September19 meeting, which she did not attend. Plaintiff Brings Plenty told Montoya that Has No Horses told the inmates that each man should decide for himself what to smoke in his pipe. Contrastingly, inmate Leonard Blue Thunder told Montoya that Has No Horses maintained his position that the inmates should not use tobacco in their pipe mixtures. *See* Docket 81-1 at 12 (describing the various stories relayed by third parties to Montoya about the September 19 meeting). There is no direct evidence from Has No Horses or from the inmates on what transpired at either meeting.

10

Defendants also offer a letter dated November 10, 2009, from Richard Two Dogs stating that he supports "Mr. Roy Stone (Wakan Iyeska) of the Sicangu Nation in his decision to ban all commercial tobacco from all Lakota Ceremonies in the South Dakota penal system." Docket 81-1 at 13. It is unclear from the record who Richard Two Dogs is, whether he is affiliated with the Native American religion, and, if he is affiliated with the Native American religion, whether his personal beliefs can be compared to plaintiffs' beliefs. Bud Johnston, who leads Native American religious ceremonies at the Jail, also supports removing tobacco from the pipe mixture. It is unclear whether Johnston also advocates for the removal of tobacco from the tie and flag ceremonies.

Defendants' evidence, the majority of which is from prison officials and volunteers, does not conclusively establish that tobacco has never been a part of Native American religious ceremonies. Defendants' evidence also does not indicate that the medicine men who allegedly told prison officials that tobacco is not traditional to the religious ceremonies represent plaintiffs' individual religious traditions. Just because the medicine men and plaintiffs are Native American does not mean that plaintiffs and the medicine men hold identical religious beliefs. "Interfaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences . . . ." *Thomas v.*

11

*Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981); *cf. Frazee v. Ill Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization."). "[N]o 'doctrinal justification' is required to support the religious practice allegedly infringed." *Gladson*, 551 F.3d at 833. An inmate's beliefs need "not fit squarely with the orthodoxy" of an established religion to be entitled to protection. *Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000) (citing *Thomas*, 450 U.S. at 715-16).

While plaintiffs could have provided more analysis on the role of tobacco in their religious ceremonies, particularly the pipe, tie, and flag ceremonies, plaintiffs have alleged that tobacco is a natural and long-standing part of their religious exercise. Consequently, the truth and sincerity of plaintiffs' religious exercise is at issue, and this issue should be determined by a jury. If the jury finds that plaintiffs' asserted religious exercise involves the use of tobacco, then defendants' October 2009 policy banning all tobacco from religious ceremonies could be a substantial burden on that religious exercise. Thus, summary judgment is denied on plaintiffs' RLUIPA claim.

### B.   Least Restrictive Means

Even if an inmate's religious practice has been substantially burdened, summary judgment is still appropriate if the prison officials can establish that the policy at issue is "the least restrictive means to further a compelling interest." *Murphy*, 372 F.3d at 988. The "compelling governmental interest" standard recognizes that "RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.' " *Fegans v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)). In passing RLUIPA, Congress was " 'mindful of the urgency of discipline, order, safety, and security in penal institutions.' " *Id.* (quoting *Cutter*, 544 U.S. at 723).

Even though Congress was mindful of an institution's right to maintain safety, " '[b]y enacting RLUIPA, Congress established a statutory free exercise claim encompassing a ***higher standard of review*** than that which applies to constitutional free exercise claims.' " *Gladson*, 551 F.3d at 832 (emphasis added) (quoting *Murphy*, 372 F.3d at 982). Because "Congress has granted additional protection for religious exercise by institutionalized persons," *Fegans*, 537 F.3d at 902, the court applies a strict scrutiny test to an RLUPIA claim if the plaintiff can show that his religious exercise has been substantially burdened. *Gladson*, 551 F.3d at 833. Once the plaintiff's threshold showing

has been met, the prison officials must show that its policy "was the least restrictive means to further a compelling interest." *Murphy*, 372 F.3d at 988.

While the safety of a penal institution can be a compelling government interest, defendants "must do more than merely assert a security concern . . . they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.' " *Murphy*, 372 F.3d at 988-89 (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1554 (8th Cir. 1996)). In *Murphy,* the prison officials prohibited inmates from holding group religious services for a religion that believed in white supremacy because the services would allegedly result in racial violence. *Id.* at 981-82. The district court granted summary judgment on the inmates' RLUIPA claim and the appellate court reversed. *Id.* at 989. The Eighth Circuit reasoned that "to satisfy RLUIPA's higher standard of review, prison authorities must provide ***some basis for their concern*** that racial violence will result from any accommodation" of the inmates' request. *Id.* (emphasis added). While the court did "not require evidence that racial violence has in fact occurred in the form of a riot" the court did "require some evidence that [defendants'] decision was the least restrictive means necessary to preserve its security interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a)(2)); *cf. Singson*, 553 F.3d at 663 (reasoning that the prison officials could establish a compelling government interest because they produced expert testimony at trial that the prohibited religious conduct posed a security risk).

14

Here, defendants argue that Native American inmates who participated in the ceremonies before the policy change in October of 2009 abused the tobacco policy because they separated tobacco from the tobacco/botanical mixture and then sold or bartered it to other inmates. Prison gangs sometimes pressured Native American inmates to sell their tobacco. In 2009, 33 inmates who participated in Native American religious ceremonies violated the tobacco policy. DOC officials suspended these inmates from purchasing the tobacco/botanical mixture for six months. Defendants argue that "[g]iven that the tobacco supply for Native American ceremonies was a primary source for contraband tobacco within DOC facilities, there was a legitimate security and safety concern in closing down that source . . . . Consequently, DOC had a legitimate security concern when it enacted this ban." Docket 82 at 9.

Defendants offer only conclusory, post hoc rationalizations to defend their alleged security concerns. Defendants have presented no evidence that there is any basis to their assertion that an occasional inmate's possession of contraband tobacco creates a specific safety or security concern. Furthermore, it appears that at least one other penal institution, the Jefferson City Correctional Center in Jefferson City, Missouri, a state maximum security prison, allows Native American inmates to possess tobacco for religious purposes. *See Fowler v. Crawford*, 534 F.3d 931, 933 (8th Cir. 2008) (noting that the maximum security prison allowed Native American inmates to possess

a sacred bundle, which "consists of a prayer pipe, sage, cedar, sweetgrass, tobacco, a medicine bag, and prayer feathers.").

Moreover, the chain of events leading up to the October 2009 policy change mitigates against defendants' asserted compelling government interest. Has No Horses approached the inmates to discuss removing tobacco from their religious ceremonies because he believes that tobacco does not belong in the ceremonies. There is no indication that defendants contacted Has No Horses or the other medicine men to discuss security or safety concerns related to plaintiffs' using tobacco in their religious ceremonies. While cultural activities coordinator Jennifer Wagner stated that tobacco violations have decreased since the October 2009 policy was implemented, there is no indication in her affidavit that security concerns motivated the change:

> [A]fter . . . Has No Horses met with Warden Weber and recommended removing commercial tobacco from Native American ceremonies, myself and others initiated discussions with the Medicine Men and Spiritual Leaders . . . to confirm that the position within the Native American community outside of DOC facilities was that commercial tobacco should not be used in these ceremonies. . . . During those discussions and consultations it was brought to my attention, and to the attention of other DOC officials, that tobacco was not traditional to the Lakota/Dakota ceremonies. . . . ***Based upon the advise [sic] and recommendation*** of the Medicine Men and Spiritual Leaders . . . the tobacco ban at DOC facilities was extended, on October 19, 2009, to include all Native American ceremonies.

Docket 81-1 at 3-4 (emphasis added). When Wagner communicated the October 2009 policy to prison officials, she again highlighted that the change

16

was meant to bring Native American inmates back to their religious traditions: "When inmates come to you to complain, please remind them that we are **honoring the request of the respected medicine men** and are going back to their traditional ways." Docket 81-1 at 18 (emphasis added).

In his letter justifying the October 2009 policy, Weber reiterated the basic facts about the abuse of the tobacco policy and that prison officials and Native American spiritual leaders have worked together in the past to address the problems. Docket 81-1 at 20. But Weber also acknowledged that the medicine men and spiritual leaders pushed for the October 2009 policy change on religious, not safety or security, grounds:

> Medicine Men and Spiritual Leaders, who lead ceremonies at our facilities, have brought to our attention that tobacco is not traditional to the Lakota/Dakota ceremonies and that it is too addictive to be used for ceremonies. **They have requested that tobacco be removed** from Native American Ceremonies so that the participants of these ceremonies will focus on their spiritual paths and not abusing the tobacco.

> Effective 10/19/09, the SDDOC **will follow the advice** of the respected Medicine Men and Spiritual Leaders and remove tobacco from Native American Ceremonies.

> . . .

> Understanding the importance of all spiritual and religious ceremonies at our facilities, our goal is to work together to ensure that no religious or spiritual path is abused.

Docket 81-1 at 20 (emphasis added).

The record lacks any evidence that the October 2009 policy was motivated by defendants' concern for the safety or security of DOC facilities due to plaintiffs' abuse of the tobacco policy. Instead, as it appears from defendants' evidence, defendants only instituted the policy change after Has No Horses and a few other medicine men voluntarily stated that tobacco is not a traditional part of Native American religious ceremonies. By following the advice of some medicine men and not consulting with plaintiffs on their individual religious beliefs, defendants have essentially defined plaintiffs' religious beliefs for them. Because defendants offer no basis for an actual threat of safety or security, they have not advanced a compelling government interest.

### C.      Least Restrictive Means

Even if the court assumes that defendants have offered a compelling government interest, defendants did not choose the least restrictive means to further that compelling government interest. Prison officials must seriously consider other alternatives before implementing their chosen policy. *Murphy*, 372 F.3d at 989. Similarly, the district court must explore any possible least restrictive means to further the government's compelling interest. *See id.* (reversing the district court's grant of summary judgment on an RLUIPA claim and reasoning that the court did not explore any other least restrictive means); *Walker v. Iowa Dep't of Corr.*, 298 Fed. App'x 535, 537 (8th Cir. 2008) (reversing

the district court because it failed to "address whether [the prison's] denial of **any** daily kosher meal option is the least restrictive means to further a compelling interest." (citing 42 U.S.C. § 2000cc-1(a))).

After inmates began abusing the tobacco policy, defendants decreased the amount of tobacco in the tobacco/botanical mixture from 50 percent tobacco and 50 percent botanicals to 25 percent tobacco and 75 percent botanicals. Defendants also suspended inmates who violated the tobacco ban from purchasing the tobacco mixture for six months.

Plaintiffs assert that many of the problems with inmates abusing the tobacco policy come from improper supervision by prison officials. Plaintiffs contend that Montoya, who is a volunteer and not a law enforcement officer, allowed inmates to take the tobacco out of their pipe and tie mixtures in her presence. They also allege that Montoya brought chewing tobacco for inmate Harold Running Bird and would leave her office door open to facilitate the theft of tobacco. Plaintiffs imply that tighter security measures or a different supervisor could decrease theft of tobacco by inmates. As another means to curtail abuse, plaintiffs suggest that inmates who violate the policy be placed into administrative segregation. Administrative segregation would be a harsher penalty than the six-month ban from buying the tobacco/botanical mixture that defendants implemented earlier.

19

Because defendants never engaged in discussions with plaintiffs about the abuse of the tobacco policy, defendants did not learn about plaintiffs' proposed alternatives. Furthermore, other less restrictive means not addressed by plaintiffs could exist and should be explored by the parties and the court. Plaintiffs have provided plausible alternatives to outlawing tobacco and both of plaintiffs' alternatives are less restrictive than the means implemented by defendants. Thus, summary judgment is denied on plaintiffs' RLUIPA claim.

## II.    First and Fourteenth Amendments

Plaintiffs also assert that defendants violated their rights under the free exercise clause of the First Amendment and their Fourteenth Amendment procedural and substantive due process and equal protection rights. Defendants argue that because plaintiffs' RLUIPA claim fails, plaintiffs' First and Fourteenth Amendment claims also fail.  Docket 82 at 9-10 ("Under the well-established law of the Eighth Circuit, if a claim fails under RLUIPA, then any claims raised under the First Amendment or the Fourteenth Amendment similarly fail."). Beyond this assertion, defendants offer *no* analysis on why summary judgment is appropriate on plaintiffs' First and Fourteenth Amendment claims.

Defendants have the burden of proof to show that, as a matter of law, they are entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 322. Because defendants have offered no argument on why they are entitled to

summary judgment on plaintiffs' First and Fourteenth Amendment claims,

summary judgment is denied on plaintiffs' First and Fourteenth Amendment

claims.

**III.    American Indian Religious Freedom Act**

Plaintiffs allege that defendants' October 2009 policy violates the

American Indian Religious Freedom Act (AIRFA):

> [I]t shall be the policy of the United States to protect and preserve
> for American Indians their inherent right of freedom to believe,
> express, and exercise the traditional religions of the American
> Indian . . . including but not limited to access to sites, use and
> possession of sacred objects, and the freedom to worship through
> ceremonials and traditional rites.

42 U.S.C. § 1996.

AIRFA, however, "is merely a statement of federal policy to protect

Indians' exercise of their religion . . . ." *Lockhart v. Kenops*, 927 F.2d 1028,

1036 (8th Cir. 1991) (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485

U.S. 439 (1988)). "Nowhere in [AIRFA] is there so much as a hint of any intent

to create a cause of action or any judicially enforceable individual rights." *Lyng*,

485 U.S. at 455. Thus, AIRFA does not create a cause of action. *Lockhart*, 927

F.2d at 1036; *see also Henderson v. Terhune*, 379 F.3d 709, 715 (9th Cir. 2004)

(reasoning that "AIRFA does not provide a means of legal recourse for any tribe

or individual . . ."). Because AIRFA does not create a cause of action, summary

judgment is granted on plaintiffs' AIRFA claim.

## IV.    International Law

Plaintiffs argue that defendants "have violated their right of freedom of religion under customary international law and the United Nations Charter, their right to protection against genocide as provided under international law and the Geneva Convention, and their rights as a 'self-governing people' under Article 73 of the United Nations Charter." Docket 71 at ¶ 32. Defendants respond that because South Dakota is a state and not a territory, it is not subject to the jurisdiction of the United Nations Charter.

Because plaintiffs did not state exactly which customary international laws have been violated, their argument that defendants violated customary international law is without merit. *See, e.g.*, *Hill v. Rincon Band of Luiseno Indians*, No. 06-CV-2544, 2007 WL 2429327, at *4 (S.D. Cal. Aug. 22, 2007) (reasoning that the plaintiff's vague claim of an international law violation could not succeed (citing *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997))). Similarly, plaintiffs' claim that defendants violated the Geneva Convention by engaging in genocide completely lacks any factual basis in the complaint and, thus, is without merit.

Article 73 of the United Nations Charter is the United Nations' declaration regarding non-self-governing territories:

> Members of the United Nations which have or assume
> responsibilities for the administration of territories whose peoples
> have not yet attained a full measure of self-government recognize
> the principle that the interests of the inhabitants of these

22

territories are paramount, and accept as a sacred trust the obligation to promote to the utmost, within the system of international peace and security established by the present Charter, the well-being of the inhabitants of these territories, and, to this end:

(a) to ensure, with due respect for the culture of the peoples concerned, their political, economic, social, and educational advancement, their just treatment, and their protection against abuses;

. . .

(c) to further international peace and security;

. . .

(e) to transmit regularly to the Secretary-General for information purposes, subject to such limitation as security and constitutional considerations may require, statistical and other information of a technical nature relating to economic, social, and educational conditions in the territories for which they are respectively responsible other than those territories to which Chapters XII and XIII apply.

United Nations Charter art. 73.

Even assuming that Article 73 applies to this action, there is no indication that Article 73 creates a cause of action under the circumstances of this case. To create a cause of action, the treaty must by its " 'terms confer rights upon individual citizens' " instead of calling " 'upon governments to take certain actions.' " *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937 (D.C. Cir. 1988) (quoting *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976)). "Treaty clauses must confer such rights in order for

23

individuals to assert a claim 'arising under' them." *Id.* (citing U.S. Const. art. III, § 2 cl.1; 28 U.S.C. § 1331).

Courts have recognized that the United Nations Charter does not create judicially enforceable rights in the United States' federal courts. *See, e.g.*, *Kyler v. Montezuma Cnty.*, 203 F.3d 835, tbl. op., No. 99-1052, 2000 WL 93996, at *2 (10th Cir. Jan. 28, 2000) (reasoning that the United Nations Charter does not confer rights upon individuals because the provisions relied on by the plaintiff "call upon governments to take certain action and are not addressed to the judicial branch of our government." (citations omitted)); *Comm. of U.S. Citizens*, 859 F.2d at 936 (declining to entertain a private suit under the United Nations Charter absent congressional authorization for a legal claim under the treaty); *Dickens v. Lewis*, 750 F.2d 1251, 1254 (5th Cir. 1984) (reasoning that "individual plaintiffs do not have standing to raise any claims under the United Nations Charter . . . ." (citation omitted)); *Nattah v. Bush*, 770 F. Supp. 2d 193, 206 (D.D.C. 2011) (reasoning that the D.C. Circuit Court of Appeals "has rejected the proposition that the United Nations charter creates rights which private individuals may enforce in litigation against nation-signatories." (citations omitted)); *Ruiz v. Martinez*, No. EP-07-CV-078-PRM, 2007 WL 1857185, at *7 (W.D. Tex. May 17, 2007) ("The UN Charter, while a treaty to which the United States is a party, governs an international organization's operations; it does not create judicially enforceable rights."); *Hill*, 2007 WL

24

2429327, at *4 (reasoning that the United Nations "Charter does not speak in terms of individual rights but rather speaks about obligations on nations. None of the purposes are intended to be judicially enforceable by individuals." (citation omitted)).

Even though it appears that the Eighth Circuit has not addressed whether Article 73 would apply to the facts in this case, the court finds the holdings of the above-cited courts persuasive. Because Article 73 only calls upon governments to take certain actions related to non-self-governing peoples and does not confer a cause of action for allegedly aggrieved individuals, Article 73 does not create an independent cause of action enforceable in this court. Thus, summary judgment is granted to defendants on plaintiffs' international law claims.

## V.   Appointment of Counsel

In the past, plaintiffs have moved to appoint counsel. *See* Docket 92 (requesting counsel for Brings Plenty); Docket 100 (requesting counsel for NACT). The court denied the earlier motions because it found that plaintiffs could adequately represent their own interests. The court finds that plaintiffs are no longer able to adequately represent their interests in this action.

The court has the discretion to appoint counsel to represent indigent civil litigants. *Rayes v. Johnson*, 969 F.2d 700, 702 (8th Cir. 1992) (citing *Wiggins v. Sargent*, 753 F.2d 663, 668 (8th Cir. 1985)). In analyzing whether a plaintiff

25

needs an attorney, the court looks to several, non-exhaustive factors: the likelihood that the plaintiff and the court will benefit from assistance of counsel; the case's factual complexity; the plaintiff's ability to investigate the facts; the existence of conflicting testimony; and the complexity of the legal issues. *Id.* (citations omitted).

Plaintiffs have alleged non-frivolous claims because their RLUIPA, First Amendment, and Fourteenth Amendment claims survived defendants' summary judgment motion. Plaintiffs' claims are factually and legally complex. Plaintiffs may struggle to investigate the facts in this case, particularly defendants' alleged security concerns. Moreover, conflicting testimony exists over the truth and sincerity of plaintiffs' religious beliefs, which could be difficult for plaintiffs, who are not legally trained, to address at a trial. Given this case's complexity, the parties and the court would benefit from the assistance of counsel.

## CONCLUSION

Summary judgment is denied on plaintiffs' RLUIPA claim because genuine issues of material fact exist on whether defendants' October 2009 policy substantially burdens plaintiffs' religious exercise. Summary judgment is also denied on plaintiffs' First and Fourteenth Amendment claims because defendants offer no argument as to why summary judgment is appropriate on those claims. Summary judgment is granted on the AIRFA claim because

AIRFA does not create an independent cause of action. Summary judgment is also granted on plaintiffs' international law claims because the customary law claim is vague, the genocide claim lacks a factual basis, and the United Nations Charter claim does not create an individual cause of action. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 80) is granted in part and denied in part.

IT IS FURTHER ORDERED that the court will appoint Pamela R. Bollweg, Sara E. Show, and Ronald A. Parsons, Jr., of Johnson, Heidepriem & Abdallah, to represent plaintiffs in this case.

Dated September 20, 2011.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

27