UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| NATIVE AMERICAN COUNCIL OF TRIBES, BLAINE BRINGS PLENTY, and CLAYTON CREEK, | ) ) ) ) ) | CIV. 09-4182-KES |
| Plaintiffs, | ) ) | MEMORANDUM OPINION |
| vs. | ) ) | AND ORDER |
| DOUGLAS WEBER, Warden of the South Dakota State Penitentiary, and DENNIS KAEMINGK, Secretary of the Department of Corrections, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs, Native American Council of Tribes (NACT), Blaine Brings Plenty, and Clayton Creek, (collectively NACT or plaintiffs), brought suit against defendants, Douglas Weber and Dennis Kaemingk,[1] alleging a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA), the American Indian Religious Freedom Act, the First and Fourteenth Amendments, and international law. The court granted summary judgment on the American Indian Religious Freedom Act and international law claims and denied summary judgment on the RLUIPA and constitutional claims. Docket 109. The court also appointed counsel to represent plaintiffs at trial.

---

[1] Plaintiffs originally brought suit against Timothy Reisch, who was Secretary of the Department of Corrections when defendants banned tobacco. During the pendency of this action, Kaemingk replaced Reisch as Secretary.

Plaintiffs seek injunctive relief in order to use tobacco in their religious ceremonies that take place at penal institutions. A court trial was held on March 27-29, 2012. After trial, the court granted a motion made by the United States to file a statement of interest. Docket 181 (containing the statement of interest). Defendants responded to the statement of interest. Docket 185. The court has considered the statement of interest and defendants' response along with the testimony, exhibits, and closing briefs[2] in determining the outcome of this case.

## FACTS

The following constitutes the court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1), which were found by a preponderance of the evidence:

### I.    Background Facts

The South Dakota Department of Corrections (DOC) operates various penal institutions in South Dakota, including the Penitentiary in Sioux Falls, the Jameson Annex in Sioux Falls, the Mike Durfee State Prison in Springfield, the minimum security unit in Rapid City, and the minimum security unit in Yankton. Douglas Weber is the director of prison operations for South Dakota.

---

[2] In their brief, plaintiffs did not discuss their First and Fourteenth Amendment claims. Because plaintiffs failed to make any argument under the First or Fourteenth Amendment and because plaintiffs have succeeded on their RLUIPA claim, the court will only discuss the RLUIPA claim.

Tr. 526:5-11.[3] During the relevant time period, Jennifer Wagner was the cultural activities director, and Mary Montoya was a volunteer in the religious and cultural activities program at the Penitentiary and Jameson Annex. Tr. 442:8-443:3.

Approximately 27 percent of the total state prison population in South Dakota is Native American, which is significantly higher than any other state's Native American prison population. Tr. 232:25-233:8; 531:8-11. The majority of incarcerated Native Americans in South Dakota are affiliated with the Oglala band of the Lakota Sioux people. Tr. 232:10-13; Ex. 114. Brings Plenty and Creek are both members of the Lakota tribe.[4] Tr. 69:20-21; 113:18-20.

NACT is a nonprofit organization dedicated to Native American issues at DOC facilities, primarily at the Penitentiary. Tr. 99:18-20. NACT oversees activities such as sweat lodge ceremonies, pipe ceremonies, and powwows, all of which occur within the various penal institutions. Tr. 99:21-25.

In 2000, the DOC banned all tobacco use except tobacco used in Native American religious ceremonies.[5] Tr. 546:16-547:19. Until a policy change in

---

[3] Unless otherwise noted, all "Tr." citations are to the trial transcript, found at Docket 170, and "Ex." citations are to the trial exhibits.

[4] The Lakota, Dakota, and Nakota are Native American tribes in South Dakota. Tr. 232:20-24. The Lakota traditionally resided west of the Missouri River in South Dakota. Tr. 232:22. The Dakota resided east of the Missouri River. Tr. 232:22. The Nakota were in the Yankton area. Tr. 232:21-24.

[5] Lakota's use tobacco in various ways for religious purposes. They are discussed in detail below.

2003 or 2005, inmates were allowed to keep tobacco for their religious ceremonies in their cells. Tr. 243:3-10 (stating that the change occurred in 2005); Tr. 470:19-471:2 (stating that the change occurred in 2003). Following this change, tobacco was kept in locked boxes and was checked out by inmates prior to religious activities. Tr. 242:4-243:8. Inmates were also allowed to make tobacco ties with minimal supervision. Tr. 96:7-97:21 (tobacco ties are discussed below).

In October of 2004, the DOC arranged for a "medicine man conference" to address tobacco problems. Tr. 471:3-14. The DOC sent invitations to medicine men or traditional healers[6] who had security approval to enter the facility. Tr. 471:3-14. Traditional healers John Around Him, Richard Two Dogs, and Charlie White Elk, tribal liaisons Jake and Myrna Thompson, Weber, and Wagner attended the conference. Tr. 243:11-244:13; 471:21-25. After the conference, mixtures used in Native American ceremonies were changed to 50 percent tobacco and 50 percent red willow bark. Tr. 244:21-24. In July of 2005, the DOC again changed the mixture to 25 percent tobacco and 75 percent red willow bark. Tr. 245:8-18; 472:1-9; Ex. 109; Ex. 133. The quantity of the mixture authorized to be distributed to inmates was also decreased from one-fourth cup to one-eighth cup. Tr. 472:10-12. Around the time that the

---

[6] A traditional Native American healer is also known as a medicine man. Tr. 22:2. Because plaintiffs' expert Richard Bernard Moves Camp testified that the Lakota use the term "traditional healer," Tr. 22:2-3, the court will use "traditional healer" or "spiritual leader" instead of "medicine man."

quantity of the mixture was reduced, the DOC also decided to grind the tobacco. Tr. 245:13-15; 474:13-25; Ex. 133. This mixture was used in all Native American religious activities that required tobacco. Ex. 133.

In 2009, NACT voluntarily imposed a disciplinary policy prohibiting inmates who were disciplined for abusing tobacco from purchasing the mixture containing tobacco for six months. Tr. 134:2-23. NACT's bylaws state that a second infraction of the tobacco policy "will result in an indefinite ban, which may be lifted only by action of the NACT council when they are convinced [the inmate] will not misuse the mixture again." Ex. 28; Ex. 29. In the summer of 2009, DOC took over enforcement of the six-month ban but not the indefinite ban. Tr. 249:2-21.

On October 19, 2009, the DOC enacted a policy banning all tobacco from DOC facilities, including tobacco for Native American religious ceremonies. Ex. 103. Because this was a policy change, the Secretary of the Department of Corrections had to approve the change, which he did. Tr. 580: 17-581:14. Plaintiffs allege that the total ban of tobacco violates their right to exercise their religion.

## II.    Role of Tobacco in the Lakota Religion

As an initial matter, the Lakota religion is passed down in the oral tradition, with older generations instructing younger generations. Tr.195:10-196:24. As noted by every traditional healer who testified, there are variances

of practice among individual tribes and traditional healers. Even Weber acknowledged that "there are differing opinions out there from different medicine men" regarding the use of tobacco. Tr. 577:21-22. Plaintiffs presented the testimony of traditional Lakota healer Richard Bernard Moves Camp,[7] and Creek and Brings Plenty to establish plaintiffs' religious beliefs regarding the use of tobacco.

Moves Camp testified that it is difficult to explain what the Lakota religion is because Lakota religion is the "Lakota cultural life," a "holistic" life. Tr. 23:1-8. Moves Camp described the development of Lakota spirituality in

---

[7] Moves Camp was born on July 7, 1956, and is a member of the Teton-Oglala band of the Lakota, Dakota, and Nakota Nation. Tr. 21:8-22:7; Ex. 31. His western education includes a B.S. with a major in human services and a minor in police community relations from Oglala Lakota College. Tr. 21:21-24; Ex. 31. He is currently completing his master's degree in human services. Tr. 21:21-24. He has worked as a social worker, case manager, school counselor, and substance abuse counselor, and he has consulted with various agencies for over 25 years. Tr. 22:16-19; Ex. 31. He is currently employed at the Crazy Horse School as a cultural advisor and wellness coordinator. Tr. 22:11-13; Ex. 31.

Moves Camp is a descendant of traditional healers from the Woputha/Chips-Moves Camp (Tiospaye) Family. Tr. 21:25-22:3; Ex. 31. He began his instruction of the Lakota religion and traditional healing when he was 14. Tr. 23:11-14. At age 16, Moves Camp became a traditional healer. Tr. 21:25-22:3.

Moves Camp has consulted with several penal institutions about the use of tobacco in Lakota religious ceremonies, including San Quentin, Folsom, Fort Leavenworth, and facilities in Wisconsin, Minnesota, and California. Tr. 26:10-14. Moves Camp believes that those facilities allow inmates to use tobacco in religious ceremonies. Tr. 26:15-17. He also testified before Congress on behalf of Native American religious freedom. Tr. 50:1-10.

terms of three gifts given to the Lakota by the spirits, and he discussed what role tobacco played in such spirituality. Tr. 26:22-27:1.

The first ceremonial gift from the spirits to the Lakota was the *inipi*,[8] or the sweat lodge. Tr. 26:24-25. The sweat lodge represents life and family and "is the anchor and the livelihood of a family to prayer." Tr. 27:3-15. After completing the four stages of life (being in the womb, birth, living the experience, and elderhood), the Lakota believe that they return to the spirit world for their first sweat lodge. Tr. 27:16-19.

Sweat lodge ceremonies are usually conducted in four rounds, meaning that the lodge is heated four times with 15-28 rocks that have been heated until they are hot enough to provide steam. Tr. 41:1-5. No more than 12 people sit in a circle with one knee up and one knee down, which is an honorable way to sit. Tr. 41:5-8. During each round, four songs are sung and four prayers are said. Tr. 41:13-14. After each round, the door is opened and water, which is considered a medicine or a sacrament, is passed around. Tr. 41:13-15. During the four rounds, the participants smoke the pipe, which contains tobacco. Tr. 41:16-18. A sweat lodge ceremony is a purification ceremony or a rehabilitative process "to help your negativity, the negative energy you feel in your body." Tr. 152:23-153:10.

---

[8]Throughout the trial, multiple witnesses used Lakota words in their testimony. The court notes the Lakota word in italics but will utilize the English word for simplicity.

The second gift was the *Ta Awi Cha*, or the sacrament of *cunli*, or tobacco, in the fire, as told in "The Changing Woman Story." Tr. 27:20-25. The story concerns "how a deer woman became part of the Lakota, and they taught them how to respect and honor the life of the woman, and how we respect our mothers and how we take care of the fire and the tobacco." Tr. 27:25-28:4. Lakota use the sacred tobacco as a sacrament and offering to the Creator. Tr. 28:4-6.

The third gift involves the sacred pipe. Tr. 28:7-8. According to oral history, there came a difficult time for the Lakota. Tr. 35:22-23. One day, two warriors were out hunting and scouting for buffalo when they came across a young woman, known as the Buffalo Calf Woman. Tr. 35:23-25. The woman was on a journey and carried a bundle with her. Tr. 35:25-36:1. She told the warriors that she was looking for a particular person, who happened to be their chief, Elk Head. Tr. 36:1-3. One of the warriors took the Buffalo Calf Woman to the chief. Tr. 36:4-6.

The Buffalo Calf Woman brought the *cannupa*, or pipe, to the people. Tr. 36:5-6; 148:15-22. She instructed the people that the pipe, which represents life, was to be used to pray in order to bring peace and harmony to the people. The pipe also represents life to the younger generations. Tr. 36:7-29:12.

The Buffalo Calf Woman also carried *cansasa*, or the inner bark of the red willow tree (also called red willow dogwood), sweetgrass, and a pipe tamper

(a small stick). Tr. 36:10-12. The Lakota believe that red willow is "a protectant, a God, a spirit." Tr. 29:5-29:14. Sweetgrass is used to smudge[9] the tobacco and the red willow bark before the mixture is placed in the pipe. Tr. 63:18-19. The Lakota smoke red willow bark and tobacco, a traditional pipe mixture. Tr. 63:18-25.[10] Red willow bark is used in the mixture to "slow[] down the burning process of the tobacco," while the tobacco is used as an offering. Tr. 81:7-12.[11]

In light of the second and third gifts, it is traditional for the Lakota to smoke red willow bark with tobacco in a pipe. Tr: 63:20-64:7. Moves Camp explained that tobacco is like the Old Testament "because tobacco has been around for a long time." Tr. 148:23-24. The pipe that the Buffalo Calf Woman brought is like the New Testament. Tr. 28:7-8. Smoking tobacco[12] in the pipe with the red willow bark represents a combination of the Old and New Testaments. Tr. 64:9-10.

---

[9] Smudging means that the smoke from the sweetgrass is waved over the tobacco and red willow bark.

[10] At one point, Moves Camp testified that Buffalo Calf Woman instructed the Lakota to smoke only red willow bark. Tr. 68:23-25. But Moves Camp earlier testified that the Lakota smoke tobacco and red willow bark. Tr. 63:18-25. Moves Camp smokes both tobacco and red willow bark. It appears that his later comment that the Buffalo Calf Woman instructed the Lakota to smoke only red willow bark was not a full recitation of Moves Camp's beliefs.

[11] Creek and Brings Plenty confirmed the Buffalo Calf Woman story as recited by Moves Camp. Tr. 85:8-12; 149:25-150:1.

[12] There is no fixed formula for the mixture of tobacco and red willow bark that is smoked out of a pipe. Tr. 30:1-2. Using between 1 and 5 percent tobacco is acceptable. Tr. 29:19-30:7.

The Lakota also use tobacco to make *canli pahta wicohan*, or tobacco or prayer tie offerings.[13] Tr. 31:1-2; 229:18-19. Each tobacco tie represents a prayer and is offered to a spirit. Tr. 31:2-6. After the prayer, the ties are burned in a fire. Tr. 31:2-6.

The Lakota combine the various sacraments during their ceremonies. For example, tobacco ties and prayer flags are burned as offerings in ceremonies such as the *Lawampi* (a thanksgiving ceremony in which tobacco is offered to the spirits), powwows, and the sundance. Tr. 84:7-21; 87:6-91:14; 105:21-106:12. The smoke from the offerings carries the prayers to the Creator. Tr. 91:7-14.

Tobacco ties and prayer flags are also used during sweat lodge ceremonies, which are often conducted at DOC facilities. Tr. 105:21-106:1. 52:14-21. Tobacco ties and prayer flags are hung inside the sweat lodge during the ceremony and are usually burned in the fire as an offering immediately after. Tr. 41:19-42:17.

In summary, tobacco "is a really important part of [Lakota] culture and ceremonies. Tobacco has been around the indigenous people for over a thousand years before the Europeans made contact with [Lakota] people." Tr. 24:3-9. "The concept, the use of the sacred tobacco, [is] to use it as a sacrament and offering it to the Gods and to the [C]reator." Tr. 27:20-28:6.

---

[13] The Lakota also use prayer flags, which are larger tobacco ties, in their ceremonies. Tr. 39:23-40:1.

Moves Camp testified that taking tobacco away from a Lakota person would be "almost like taking a Bible away from the church. It's like saying you can go to church, but you can't use the Bible." Tr. 51:12-15. Tobacco is a center of Lakota life and is often given as a gift to an elder. Tr. 51:22-24. Moves Camp agreed that tobacco is fundamental to Lakota religion and it would be difficult for a Lakota to pray without it. Tr. 55:10-18.

### A.    Creek's Religious Beliefs About Tobacco

Creek was born on the Cheyenne River Sioux Reservation on June 11, 1965, and is an enrolled member of the Minnecojou Lakota. Tr. 69:17-23; 113:18-20. He has practiced the Lakota religion since he was a child. When he was five years old, Creek participated in a healing ceremony.[14] Tr. 70:6-9.

Creek would observe and help his mother, an aunt, or grandmother make tobacco ties about twice a week. Tr. 73:10-17. When his mother made the ties, she would pray for the family, the community, and all living things. Tr. 85:16-19. After she made the ties, Creek hung the ties in the middle of a plum tree near the creek. Tr. 85:19-24. After the ties hung in the tree a few days, Creek's mother would take the ties down and burn them. Tr. 86:1-2. Creek's family also used tobacco ties during sweat lodge ceremonies. Tr. 86:3-9.

---

[14] A healing ceremony requires an altar that is constructed partly with tobacco and also requires making 405 tobacco ties which are used in the ceremony. Tr. 70:10-71:6. A healer also smokes tobacco in a pipe during the ceremony. Tr. 70:10-71:6.

Creek participated in the sweat lodge ceremony every week growing up, and he has continued to participate in sweat lodge ceremonies while he has been incarcerated. Tr. 73:1-9. As a child, Creek also participated in pipe ceremonies with his elders. Tr. 73:18-74:8. Creek is currently a pipe-carrier.[15]

Creek's family used different pipe mixtures for different ceremonies. Tr. 82:18. They used 100 percent tobacco in their sweat lodge ceremonies and a mixture of red willow bark and tobacco in their pipe ceremonies. Tr. 82:22-23. Creek used only tobacco for tobacco ties and flags. Tr. 84:13-16. None of Creek's ancestors or traditional healers ever instructed him to smoke only red willow bark. Tr. 109:21-24.

Creek admitted to violating the DOC's rules regarding possession of tobacco. Tr. 93:25-94:2. A June 13, 2006, disciplinary report stated that officers found a plastic bag and a yellow envelope containing tobacco divided up into small packages taped to the bottom of Creek's bed. Tr. 135:8-136:15; Ex. 121. A July 8, 2005, disciplinary report stated that after Creek was called

_____

[15] The role of a pipe-carrier is to tend to the sacred pipe, a duty which may be passed down from generation to generation. Tr. 43:12-13; Tr. 43:22-23. Being a pipe-carrier is a big responsibility because the pipe-carrier takes care of the pipes and the mixture to be smoked in the pipe; he should live a healthy life and remain drug and alcohol free. Tr. 42:21-43:4. "As a pipe carrier, you take on the burden to carry the world on your shoulders. In our culture, we say *wotakuye oyasin.* That means all my relations, everything that is living on this planet and beyond." Tr. 74:10-14.  A person must earn his way to become a pipe-carrier "through knowledge, learning what the significance of the pipe is, what the purpose of the pipe is, and your responsibility." Tr. 75:18-21. Creek and Brings Plenty are both pipe-carriers (there are about five other pipe-carriers at the Penitentiary). Tr. 75:22-78:23; 154:16-155:13.

out of the sweat lodge for a visitor, a correctional officer noticed that Creek's bag of tobacco was open. Tr. 136:20-137:9; Ex. 122. Creek explained that another inmate did not have any tobacco mixture, so he opened his bag and allowed the other inmate to fill his pipe, which violated DOC rules. Tr. 136:20-137:9; Ex. 122. An April 6, 2005, disciplinary report stated that an officer found a manila envelope with tobacco, rolling papers, and five rolled papers during a "shakedown" of Creek. Tr. 137:18-138:5; Ex. 124. A July 28, 2003, disciplinary report stated that an officer found tobacco in a sock in Creek's cell during a "shakedown." Tr. 139:12-18; Ex. 127. Creek testified that he received the prohibited tobacco from Caucasian inmates who brought the tobacco in through the visiting room. Tr. 94:5-8. There is no evidence that any of the tobacco involved in these violations came from sources associated with the Lakota religion.

Creek testified that "[t]obacco is essential to our belief. Tobacco is an offering. It's one of the greatest offerings we can give to our Higher Power. He gives us life . . . In return, we offer . . . tobacco." Tr. 86:22-87:1.

After the DOC banned tobacco, Creek continued to attend pipe and sweat lodge ceremonies. Tr. 144:12-17. He has smoked red willow bark instead of the mixture of red willow bark and tobacco. Tr. 144:18-21. Creek testified that his "whole essential belief system has been taken" away after DOC imposed the tobacco ban. Tr. 145:1-6.

13

**B.     Brings Plenty's Religious Beliefs About Tobacco**

Brings Plenty was born on May 11, 1965, and he has practiced the Lakota religion since he was a child, when he helped his mother make tobacco ties. Tr. 150:7-12. His grandfather was an announcer for powwows and was a pipe-carrier. Tr. 150:13-18. For "[a]s far back as [he] can remember," Brings Plenty has always used tobacco in his religious ceremonies such as in his pipe mixture and in tobacco ties. Tr. 153:14-154:7; 157:14-17 ("From my earliest memory growing up on the reservation, I have always seen tobacco used at Sundances, at [healing] ceremonies, at sweat lodge ceremonies. I have always seen it.").

Brings Plenty has participated in various Lakota religious rituals, particularly sweat lodge ceremonies, at the Penitentiary since he was incarcerated there in February of 1989. Tr. 150:24-151:8. Brings Plenty is a pipe-carrier and a fire-keeper[16] at the Penitentiary. Tr. 154:1; 155:14-15. He also works with Montoya to guard the sweat lodge, and he addresses complaints about the sweat lodge with other Native American inmates. Tr. 156:12-19.

Brings Plenty has two disciplinary reports for violating the tobacco policy. An April 25, 2008, report stated that an officer found rolling papers with a

---

[16] A fire-keeper sets up the rocks in the fire pit that is inside the sweat lodge prior to the ceremony. Tr. 155:16-156:9. Before heating the rocks, Brings Plenty smudges the rocks with sage and, before the ban, put some of the tobacco mixture in the fire. Tr. 155:16-156:9.

trace of tobacco on them in Brings Plenty's pocket during a strip search. Tr. 186:8-187:22; Ex. 116. A December 13, 2006, disciplinary report stated that Brings Plenty was found with two bags of tobacco and a screen during a "shakedown" after making tobacco ties. Tr. 188:2-20; Ex. 117.

When DOC implemented the tobacco ban, he felt that a part of him was being taken away; he was offended. Tr. 158:5-10. To Brings Plenty, tobacco is a central part of his beliefs. Tr. 158:11-12. Brings Plenty testified that prison can be a spiritual place of healing, and that he is "a changed person, because . . . like a lot of the young guys up there, I used to be a little crazy. Now I try to help them." Tr. 201:24-202:20. Weber has acknowledged that Brings Plenty believes tobacco is important to his religion. Tr. 588:5-11.

## III.   DOC's Complete Ban of Tobacco

### A.   DOC's Proffered Reasons for the Ban

Wagner testified that defendants banned tobacco because of security reasons. Tr. 303:5-9. After being confronted with her affidavit in support of defendants' summary judgment motion, in which she stated that defendants banned tobacco at the request of the traditional healers, Docket 81-1, Wagner testified that she "decided to follow the advice of the respected medicine men and spiritual leaders and remove tobacco from Native American ceremonies." Tr. 304:3-7.

15

Weber similarly testified that the ban was motivated by security issues. Tr. 554:6-20. He said that before the ban, multiple problems arose at DOC facilities from contraband tobacco trafficking, including violence, assaults, and coercion. Tr. 547:20-550:10. Tobacco "could be used to pay off gambling debts. It could be used for gang activity. It could be used for sexual favors." Tr. 235:5-7. During the time that DOC allowed Native Americans to use tobacco in religious ceremonies, Weber claimed that a black market for tobacco existed. Tr. 549:7-551:12. While Weber testified that some of the tobacco came from the mixture used in Native American religious ceremonies because there were "examples of tobacco confiscated that had been through the grind process," he could not be certain of the source of tobacco in all instances. Tr. 549:7-551:12.

Breon Lake, a former inmate who testified on behalf of defendants, stated that he watched Native American inmates pick tobacco out of the red willow bark and tobacco mixture and that other inmates approached him to buy his pipe mixture. Tr. 337:16-338:2. If Lake were not going to smoke his pipe mixture, the inmates would pick out the tobacco. Tr. 337:23-338:2.

Brings Plenty, who has been incarcerated longer than Lake, has never witnessed two inmates fight over tobacco. Tr. 173:3-8. Creek, who has also been incarcerated longer than Lake, never saw anyone remove tobacco from the pipe mixture. Tr. 132:5-8. Creek recalled two times when some inmates whom he thought wanted tobacco attended either a sweat lodge or pipe ceremony to

16

receive tobacco. Tr. 132:19-133:1. But Creek was never threatened by other inmates to separate his tobacco and give it to them. Tr. 103:14-17. He was unaware of gang activity or violence that resulted from inmates attempting to get tobacco from Native American inmates. Tr. 103:18-24.

Even though defendants have asserted that they banned tobacco due to security concerns stemming from the tobacco black market, they allowed Native American inmates to be unsupervised when making tobacco ties. Tr. 458:15-460:11. The room where tobacco ties were made held up to 35 people, and other inmates besides pipe-carriers, sundancers, and fire-keepers were allowed to make tobacco ties. Tr. 457:25-458:8. In addition, inmates are not supervised at either sweat lodge or pipe ceremonies. Tr. 255:4-13. Inmates attending either ceremony simply check in with a correctional officer before they go to a ceremony. Tr. 255:4-13. Instead of direct supervision, the Penitentiary has a camera system in the chapel area, and one officer is stationed in the chapel area to supervise all activities in that area. Tr. 227:22-228:5.

The DOC's security reasons for banning tobacco, as presented through Weber's and Wagner's trial testimony, conflict with the contemporaneous documentation produced by the DOC regarding the ban. In a letter dated October 19, 2009, addressed to "Tribal Liaisons, Spiritual Leaders, Pipe Carriers, and Sundancers," Weber conveyed that the DOC had banned all

17

tobacco. Tr. 557:25-558:19; Ex. 103. Weber relayed the security concerns of

inmates separating tobacco from their pipe and tie mixtures and reiterated that

he had reached out to NACT and other groups to prevent the abuse of tobacco.

Ex. 103.

The majority of Weber's letter, however, concerned religious reasons for

banning tobacco:

> Medicine Men and Spiritual Leaders, who lead ceremonies at our
> facilities, have brought to our attention that tobacco is not
> traditional to the Lakota/Dakota ceremonies and that it is too
> addictive to be used for ceremonies. They have requested that
> tobacco be removed from Native American Ceremonies so that the
> participants of these ceremonies will focus on their spiritual paths
> and not abusing the tobacco.
>
> Effective 10/19/09, the SDDOC will follow the advice of the
> respected Medicine Men and Spiritual Leaders and remove tobacco
> from Native American Ceremonies. All Native American ceremonies
> will continue with the use of other botanicals (cansasa, sage, bitter
> root, bearberry, lovage, flat cedar, sweet grass, etc.).

Ex. 103. While Weber's letter stated that spiritual leaders said that tobacco is

not traditional, he admitted at trial that some spiritual leaders, tribal liaisons,

and tribal leaders did not support his decision to ban tobacco. Tr. 558:7-19.

Indeed, Weber acknowledged that there are differing opinions from various

medicine men about Lakota spiritual beliefs. Tr. 576:19-22.

For example, John Yellow Bird Steele, president of the Oglala Sioux

Tribe, supports the inmates' request to regain the right to use tobacco in their

religious ceremonies. Tr. 292:5-12. Wagner admitted that she later learned that

18

President Yellow Bird Steele supports inmates' use of tobacco in their religious ceremonies because President Yellow Bird Steele wrote a letter to Wagner expressing those views. Tr. 292:5-24.[17] Wagner has never spoken with President Yellow Bird Steele, even though he is president of the tribe to which a large portion of inmates belong, and she took no action after receiving his letter. Tr. 293:5-294:23. Wagner did not notify President Yellow Bird Steele prior to the ban about the DOC's intention to ban all tobacco. Tr. 293:23-294:9.

Additionally, Wagner's email dated October 19, 2009, to various DOC officials, also listed religious, not security, reasons for banning tobacco: "[T]obacco is being removed from all Native American Ceremonies per the request of Medicine Men who lead ceremonies at our facilities. . . . When inmates come to you to complain, *please remind them that we are honoring the request of the respected Medicine Men and are going back to their traditional ways*." Tr. 304:8-25; Ex. 108 (emphasis added).

Specifically regarding tobacco ties and prayer flags, Weber testified that he heard in the past that Native Americans have used botanical ingredients other than tobacco in the ties and flags. Tr. 578:6-17. But he could not list any Native American who told him that tobacco is not necessary in ties and flags, and he acknowledged that until the ban, he called prayer ties "tobacco ties." Tr.

---

[17] Exhibit 13, a letter dated March 13, 2012, from John Yellow Bird Steele, was refused as evidence. Tr. 292:16-293:3; Docket 168.

578:6-17. He further acknowledged that some Native Americans believe that tobacco ties, filled with tobacco, are an essential part of their religion. Tr. 579:15-18.

To support the DOC's view that the "respected medicine men and spiritual leaders" supported removing all tobacco, implying tobacco is unnecessary in the practice of the Lakota religion, defendants rely on the 2004 spiritual conference, a 2009 meeting with Sidney Has No Horses, and other discussions with traditional leaders.

As stated above, DOC officials had a spiritual conference in 2004, during which the abuse of tobacco in DOC facilities was discussed. Tr. 552:25-554:5. Weber testified that the 2004 meeting was "absolutely . . . [o]ne of the considerations" in his decision to ban all tobacco. Tr. 554:1-5. But the conference was held in 2004, and the DOC did not ban tobacco until October of 2009. The DOC presented no evidence that the 2004 conference resulted in any determination that tobacco should be banned from Lakota religious ceremonies five years later.

### 1.    Reliance on Has No Horses

According to Montoya's notes from a September 2009 meeting, inmates asked Has No Horses[18] "to be their main medicine man." Tr. 479:25-480:13.

---

[18] Has No Horses, a descendant of holy men, is a Lakota holy man. Tr. 362:24-363:1. Both Has No Horses and Moves Camp are descendants of Horn Chips. Tr. 396:1-5.

Weber met with Has No Horses after the September 2009 spiritual conference. Tr. 554:25-555. Montoya asked Has No Horses to tell Weber what he told the inmates about using tobacco. Tr. 555:17-20. According to Weber, Has No Horses "without any prompting from me whatsoever" said "that he thought tobacco should not be allowed at the prison." Tr. 555:21-23. Weber did not testify that he personally followed up with Has No Horses or any other Lakota spiritual leader about banning tobacco. Tr. 556:10-22.

In contrast, Has No Horses later told inmates that he told neither Weber nor Montoya that he thought all tobacco should be banned. Tr. 601:8-14. He clarified that he told Montoya and Weber that he uses red willow bark in his pipe and that "[e]ach pipe carrier here and each medicine man and Sundancer has a right to put what they want in their pipes." Tr. 601:8-18.

Moreover, Has No Horses's testimony did not support defendants' assertion that he supported the tobacco ban. He testified that he told Montoya that "if you caught an individual selling cigarettes from these tobacco ties, they should be individually punished, not the whole populous." Tr. 394:13-22. He clarified that when he used the word "ban" with DOC officials, he meant that tobacco violations should result in personalized tobacco bans, not that all tobacco should be banned. Tr. 395:6-14.

Has No Horses testified that tobacco plays an important role in how he practices his Lakota religion. When he performs his duties as a holy man,

21

people bring him tobacco as a gift. Tr. 365:10-18. Has No Horses also uses loose leaf tobacco in his tobacco ties and prayer flags. Tr. 376:9-381:24. According to Has No Horses, DOC officials "wanted to know what I used [in my prayer flags], so I told them, yes, I use no chemical, no addictive tobacco, such as American Spirit, Native Spirit, you know, those that don't have any chemicals preferably." Tr. 380:23-383:12.

Has No Horses uses only red willow bark in his pipe, but acknowledged that other tribes and healers may do things differently. Tr. 374:13-375:15. Due to the Lakota religion being driven underground during past time periods, different families have practiced the Lakota religion in different ways. Tr. 390:23-391:15. Traditional healers, even if they belong to the same tribe, may have divergent views on whether tobacco should be used in the pipe mixture. Tr. 391:19-22.

Weber and Montoya mischaracterized Has No Horses's beliefs regarding the role of tobacco in Lakota religious ceremonies and whether he believed that DOC officials should ban the use of all tobacco. Thus, defendants' reliance on Has No Horses' statements does not support their contention that traditional healers encouraged them to ban tobacco.

### 2.    Other Viewpoints

Wagner also consulted some Native American religious leaders about the ban, including Charlie White Elk, Richard Two Dogs, Roy Stone, and Francis

22

Johnston, also known as Bud Johnston. Tr. 250:22-251:2; 299:6-300:3; 400:22-401:2.[19]

Wagner testified that she spoke with Roy Stone, a traditional healer and an enrolled member of the Rosebud Sioux Tribe, about the use of tobacco in Lakota religious ceremonies around September 25, 2009. Tr. 252:18-21. Stone, however, testified that he only spoke to Montoya about banning tobacco. Docket 153-2; Tr. 9:13-19. There is no indication that NACT has invited Stone to lead religious ceremonies or that his religious beliefs reflect those of plaintiffs. Docket 153-2; Tr. 8:24-9:2.

Stone never urged defendants to ban tobacco. Instead, Montoya spoke with him about her belief that inmates should only be allowed to use red willow bark in their ceremonies, and he agreed with her decision. Docket 153-2; Tr. 12:2-11. After that conversation, Montoya and Wagner wrote a statement for Stone to sign. Tr. 252:17-253:8; Ex. 137.[20]

─────────────────────

[19] Defendants also offered the testimony of Breon Lake, a former inmate and helper to Bud Johnston. Lake is Dakota, not Lakota. Tr. 330:12-332:7. He follows Johnston's church and adheres to the Native American Church, which is a blend of Native American and Christian beliefs. Tr. 348:11-12. Lakota who practice the Lakota religion may not agree with the Native American Church's belief system. Tr. 349:19-22. Because defendants did not rely on Lake's belief system when they made their decision to ban tobacco and because his beliefs are very different from plaintiffs' beliefs, his testimony is not included in the factual conclusions.

[20] Stone did not write Exhibit 137, but instead signed his name to a statement that Montoya and Wagner wrote for him. Wagner testified that Stone was able to read the statement in English. Tr. 253:5-8. But Stone was unable to complete his deposition in English. An interpreter assisted Stone throughout

While Stone uses red willow bark (which he interchangeably called *cansasa*, *kinnikinnick*, and tobacco) in his pipe, he uses only tobacco in his tobacco ties and prayer flags. Docket 153-2; Tr. 5-11; 17:1-23:14. Stone further acknowledged that different people follow different spiritual leaders. Docket 153-2; Tr. 17:21-18:22.

Stone does not provide support for defendants' assertion that he supported the tobacco ban. According to Stone, he never urged DOC officials to ban tobacco and, instead, agreed with Montoya's belief that only red willow bark should be smoked. There was no indication that he supported removing tobacco from the prayer and flag ties. Moreover, there is no indication that Stone's religious beliefs are similar to Creek's and Brings Plenty's beliefs. Thus, Stone's testimony does not negate the aforementioned evidence that demonstrates the importance of tobacco in the Lakota religion.

At one time in her testimony, Wagner stated that she met with Richard Two Dogs[21] regarding the proposed tobacco ban. Tr. 250:24-251:2. According to Two Dogs, commercial tobacco is not traditional to Native American religion. Docket 153-1; Tr. 12:23-12:5. Two Dogs testified that *cansasa* (not *kinnikinnick*, which is not a Lakota word) has been mixed with commercial

the deposition. When confronted with Exhibit 137, Stone stated that was the first time he had seen the paper. Docket 153-2; Tr. 12:12-24.

[21] Two Dogs is an enrolled member of the Oglala Lakota Sioux and is a spiritual leader. Docket 153-1, Tr. 4:2-19.

tobacco in modern times, but he does not use such a mixture in his ceremonies. Docket 153-1; Tr. 15:11-17:3. Two Dogs supports the DOC's ban on commercial tobacco because he believes that his people have had too many issues with lung cancer. Tr. 19:5-25; 29:25-30:13.[22] While Two Dogs would support the use of tobacco grown by Native Americans in Native American religious ceremonies, the Lakota, Dakota, and Nakota do not grow tobacco. Tr. 25:22-26:1; 35:12-36:3.

Two Dogs represents only one view of traditional Lakota healers regarding the use of tobacco. Tr. 27:17-18:7. He acknowledged that other people use tobacco in tie and flag ceremonies and that such ceremonies are important in the Lakota religion. Tr. 23:6-24:6; 27:5-10.

Defendants offered no concrete evidence that Creek or Brings Plenty follow the Lakota beliefs as articulated by Two Dogs. Instead, Creek and Brings Plenty testified that they have always used tobacco in their religious ceremonies. Moreover, Two Dogs acknowledged that Moves Camp is a well-

---

[22] During the trial, the court reserved ruling on whether to admit Exhibit 106, a letter dated November 10, 2009, from Two Dogs to "whom it may concern" at the DOC. Tr. 597:4-598:10. The letter "is in support of Mr. Roy Stone . . . in his decision to ban all commercial tobacco from all Lakota Ceremonies in the South Dakota penal system." Ex. 106. The court sustained as hearsay NACT's objections to portions of Two Dogs's deposition regarding why he wrote the letter. Docket 165. The letter is an out-of-court statement offered for the truth of the matter asserted, namely that Two Dogs supports the DOC's decision, and, thus, is hearsay. Fed. R. Evid. 801, 802. Even if the letter were admitted, it only states that Two Dogs supports Roy Stone's decision to ban tobacco. It provides no analysis of tobacco's role in the Lakota religion.

respected traditional healer and some Lakota use tobacco in their religious ceremonies. Given the intra-faith differences in the Lakota religion, Two Dogs's testimony about his beliefs does not alter the court's findings of fact as to Creek and Brings Plenty's beliefs that tobacco is important to their religious exercise.

Weber also relied on a letter written by Bud Johnston supporting the ban in making his decision to ban tobacco even though Weber does not "know anything about Bud Johnston[.]" Tr. 588:17-589:6. Johnston is an enrolled member of the Bad River Band of Lake Superior Chippewa. Tr. 400:22-401:2. He is not Lakota. Tr. 431:15-18.

Johnston "pretty much" picked up his familiarity with pipe ceremonies as an adult. Tr. 406:13-19; 421:20-23. He did not grow up practicing his religion except during a few isolated religious encounters. Tr. 411:19-413:15. Johnston does not consider himself to be a medicine man or spiritual leader or advisor. Tr. 406:3-7.

Either Montoya or Wagner asked Johnston to write a letter supporting the DOC's ban on tobacco.[23] Tr. 417:3-418:17; 429:12-430:13; Ex. 6. In response to that request, Johnston wrote a letter dated September 29, 2009, addressed to Weber, stating that he supported the tobacco ban and "[i]nmates

---

[23] Montoya could not recall whether she or Wagner asked Johnston to draft the letter. She stated that it was "possible" that Johnston sent her the email dated September 30, 2009. Tr. 513:21-512:8.

who really know about their culture will have no problem with this and the others who just want a smoke will just go away." Ex. 107. He also stated that a few years ago, he and a couple of others had gone to lunch with DOC officials and stated that "[i]t was unanimous that we [Johnston, Lake, and Lake's teacher Galen Drapeau, Sr.] thought the red willow blend . . . was the proper thing to use, commercial tobacco is not needed at all." Ex. 107; Tr. 431:3-14. He acknowledged that he did not speak for the Lakota and he could not speak for them because he is not Lakota. Tr. 431:15-18.

When asked about his understanding of how the pipe became part of Native American spirituality, Johnston responded "I don't have a real story about that. Our people were given the gift of the *kinnikinnick*, which is what we use. It's the inner bark of the red willow mixed with bearberry and whatever you have in your area. Ours, a hummingbird brought that gift to the people." Tr. 411:11-15. Moreover, Johnston's "people don't normally use prayer ties." Tr. 415:25-416:2.

Johnston's testimony regarding Lakota religious beliefs is not credible. Johnston is not a traditional Lakota healer; he is not even Lakota. He has not had the training that the other Lakota religious leaders, such as Moves Camp and Has No Horses, have received. His story about the origin of the pipe also differs because he believes that a hummingbird, not the Buffalo Calf Woman, brought the pipe to his people. His religious beliefs, including the lack of

tobacco ties and flags, and his use of *kinnikinnick* instead of red willow bark or tobacco, drastically differ from the Lakota religious beliefs outlined by Moves Camp, Has No Horses, Creek, and Brings Plenty.

Lastly, White Elk, who passed away in December of 2009, wrote a letter in which he stated that he supported discontinuing the use of tobacco in ceremonies. Tr. 251:7-252:13; Ex. 138. The court received the letter for the limited purpose of showing that the DOC took action based on White Elk's letter. Tr. 251:7-252:13. White Elk's letter does not state what role tobacco plays in the Lakota religion and, instead, relays his concerns about addiction to commercial tobacco. Ex. 138. Due to his passing, White Elk was unable to testify in this case. His exact beliefs about the role of tobacco in the Lakota religion are unknown, and the letter sheds no light on whether tobacco is essential to the Lakota religion.

After considering all the evidence, the court finds that tobacco is part of the exercise of the Lakota religion and the plaintiffs' own views about tobacco's role in their religion are sincere. The majority of DOC's evidence demonstrated that the tobacco ban was implemented because of the DOC's incorrect belief that the Lakota religion does not necessitate tobacco for its practice.

**B.     Impact of the Ban**

Weber gave conflicting testimony on whether contraband tobacco is still a problem at DOC facilities. He stated that he did not "know of any cases

today" of tobacco entering DOC facilities. Tr. 591:9-12. But he then stated that the DOC combats trafficked tobacco on a daily basis. Tr. 591:9-12. Weber also did not "dispute that contraband tobacco is in great demand. It has high value, and inmates still pursue it." Tr. 591:21-22. Wagner acknowledged that tobacco was entering DOC facilities illegally, including tobacco entering the facilities through visitors, employees, volunteers, and other inmates. Tr. 306:21-307:15. Defendants offered no evidence of how many tobacco-related offenses occurred before and after the ban. Tr. 592:6-24.

The number of people attending sweat lodge ceremonies has remained consistent, but the number of inmates attending the pipe and tie ceremonies has decreased after the ban. Tr. 481:8-17. Before the ban, 34 people a week participated in making tobacco ties and there was a 4-week waiting period to get on the list. Tr. 259:18-260:3; Ex. 141. After the ban, 13 people a week participated in making tobacco ties, and there was no waiting period. Ex. 141. Before the ban, 25 inmates participated in pipe ceremonies, while only 13 participated in pipe ceremonies after the ban. Ex. 141.

Separately, all of the DOC officials who testified stated that religious activities are very important to life at the facilities and can help inmates in the rehabilitation process. Montoya testified that religious activities can be very helpful for the inmates, because "embracing their culture helps them grow in an environment that might otherwise swallow their souls[,]" and religious and

cultural activities can "make[] a big difference in their lives." Tr. 519:1-23.
Weber acknowledged that religion is "essential," and he believes that he could
not "do [his] job very well at all without the religious basis and the ability for
inmates to practice their religion and learn from their religious leaders and
become better people as a result of that." Tr. 531:12-19.

### C.      Tobacco Policies at Other Institutions

Wagner researched other institutions' policies regarding the use of
tobacco in Native American religious ceremonies. Tr. 237:2-22. Prison facilities
in Nebraska and North Dakota are tobacco free. Tr. 237:10-22. Minnesota
allows tobacco only if a Native American volunteer (who is able to show his or
her tribal enrollment papers) brings the tobacco into the facility. Tr. 237:13-20.
Wagner only researched these three states.[24] During trial, however, Wagner
admitted that other maximum security prisons allow Native American inmates
to use tobacco in their religious ceremonies. Tr. 287:22-25.

Additionally, Moves Camp testified that he had previously consulted with
several penal institutions about the use of tobacco in Lakota religious
ceremonies, including San Quentin, Folsom, Fort Leavenworth, and facilities in
Wisconsin, Minnesota, and California. Tr. 26:10-14. Moves Camp believes that
those facilities allow inmates to use tobacco in religious ceremonies. Tr. 26:15-
17.

---

[24] Iowa apparently still allows tobacco in its facilities.

30

## LEGAL CONCLUSIONS

Plaintiffs allege that defendants violated their rights under RLUIPA:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)-(2). RLUIPA "prohibits substantial burdens on religious exercise, without regard to discriminatory intent." *Van Wyhe v. Reisch*, 581 F.3d 639, 654 (8th Cir. 2009).[25]

RLUIPA protects inmates' religious exercises when a "substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b). The parties do not dispute that RLUIPA applies to DOC facilities and South Dakota state governmental officers. *See also Sossamon v. Texas*, 131 S. Ct. 1651, 1656 (2011) (reasoning that for purposes of RLUIPA, " 'government' includes, *inter alia*, States, counties, municipalities,

---

[25] At one point in its statement of interest, the United States asserts that "[t]he only appropriate avenue for judicial inquiry is whether an institution's policy interferes with an exercise of religion." Docket 181 at 8. Defendants contend that this standard is "far too narrow, not supported by authority, and not the standard stated by the Eighth Circuit[.]" Docket 185 at 2. "Interferes with" is too narrow because RLUIPA uses the "substantial burden" test. 42 U.S.C. § 2000cc-1(b).

their instrumentalities and officers, and persons acting under color of state law." (citing § 2000cc-5(4)(A))).

" 'By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims.' " *Gladson v. Iowa Dep't of Corrections*, 551 F.3d 825, 832 (8th Cir. 2009) (quoting *Murphy v. Mo. Dep't of Corrections*, 372 F.3d 979, 987 (8th Cir. 2004) (*Murphy I*)); *see also Van Wyhe v. Reisch*, 581 F.3d 639, 649 (8th Cir. 2009) (reasoning that RLUIPA "explicitly provides for a cause of action to enforce the heightened free exercise right it creates." (citing 42 U.S.C. § 2000cc-2(b))). "To make out a prima facie RLUIPA claim against a state official, an inmate 'must show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion.' " *Van Wyhe*, 581 F.3d at 654 (quoting *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009)). If the inmate meets this prima facie showing, "then the government bears the burden of persuasion on every other element of the claim." *Id.* (citing § 2000cc-2(b)).

## I.  Substantial Burden on the Exercise of Religion

RLUIPA defines "religious exercise" as "including the exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A); *see also Gladson*, 551 F.3d at 832 (same). The Eighth Circuit Court of Appeals has announced various ways for an inmate to make RLUIPA's threshold showing:

[T]o demonstrate a substantial burden on the exercise of religion, a government policy or action "must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Van Wyhe*, 581 F.3d at 649 (alterations in original) (quoting *Patel v. United States Bureau of Prisons*, 515 F.3d 807, 813 n.7 (8th Cir. 2008)). While a prison "must permit a reasonable opportunity for an inmate to engage in religious activities[,]" it "need not provide unlimited activities." *Id.* at 657.

Plaintiffs must present evidence to show that defendants have substantially burdened their ability to exercise their religion. *See, e.g.*, *Patel*, 515 F.3d at 814 (reasoning that the inmate could not meet this threshold showing because he offered only a "single, vague and unsupported statement" and "the record offer[ed] no evidence" regarding the inmate's claims). "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (citations omitted). " '[T]he truth of a belief is not open to question;' rather, the question is whether the objector's beliefs are 'truly held.' " *Gladson*, 551 F.3d at 833 (quoting *Gillette v. United States*, 401 U.S. 437, 457 (1971)). Congress has instructed the court to broadly construe RLUIPA to protect

33

"religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

### A.     Nature of the Religious Beliefs

Creek and Brings Plenty, both Lakota, testified that tobacco has always been an essential part of their religious beliefs. Creek's religious practices before he was incarcerated involved tobacco. For example, tobacco was used by the traditional healer in the *Yuwipi*, or healing, ceremony, which he attended when he was five years old. As a child, Creek watched his elders fill the pipe with loose-leaf tobacco and smoke the pipe during ceremonies. At the age of 16, Creek became a pipe-carrier. In 2003, while he was incarcerated, Creek again became a pipe-carrier. Creek continues to be a pipe-carrier.

Creek's family also made tobacco ties and would hang the ties in the middle of a plum tree. The tobacco ties also hung during the sweat lodge ceremony, and, after the ceremony, they were burned as an offering. Similarly, Creek's family used tobacco to make prayer flags to give offerings to the four directions. The flags hung in the sweat lodge, and after the ceremony they were burned as an offering.

According to Creek, "[t]obacco is essential to our belief. Tobacco is an offering. It's one of the greatest offerings we can give to our Higher Power. He gives us life, and he gives us what we have today. In return, we offer—we can offer tobacco." Tr. 86:22-87:1. According to Creek, "[t]obacco, the fundamental

part about it is the offering that we make, the sacrament that we give. As Lakotas, we believe we should always give rather than receive." Tr. 111:19-21.

Brings Plenty similarly testified that "[a]s far back as [he] can remember," he has used tobacco in religious ceremonies. Tr. 153-154. From his earliest memory of growing up on the reservation, he remembers seeing tobacco used at sundances, healing ceremonies, and sweat lodge ceremonies. He used tobacco in religious ceremonies as a child, including helping his mother make tobacco ties. Brings Plenty was taught that tobacco is used in the pipe, and the spirits take the smoke up to the Creator.

Brings Plenty is heavily involved with Native American religious ceremonies at the Penitentiary, where he is a pipe-carrier and fire-keeper. He prepares the sweat lodge ceremonies and attends almost every ceremony. Brings Plenty testified that tobacco is a central tenet of his Lakota beliefs, and he felt that a part of him had been taken away when the DOC banned all tobacco. Brings Plenty testified that prison can be a place of spiritual healing, and he is a changed person as a result of his involvement in Lakota religious ceremonies at the Penitentiary. Tobacco has played a role in this spiritual healing.

Moves Camp, a traditional Lakota healer and descendant of traditional healers, explained the importance of tobacco in the Lakota religion. In the second gift given to the Lakota, the Lakota received tobacco, which is similar to

35

the Old Testament in Lakota religious beliefs. The Lakota received the third gift when the Buffalo Calf Woman brought the pipe and red willow bark. The pipe represents a sort of New Testament. The Lakota smoke a mixture of red willow bark and tobacco in a pipe to represent the Old and New Testaments. Creek and Brings Plenty agreed that Moves Camp's testimony was similar to their religious beliefs.

According to Moves Camp, banning all tobacco has stripped plaintiffs of their ability to pray in the way in which plaintiffs are accustomed. He stated that the ban has substantially interfered with the proper expression of their religious beliefs.

In their post-trial brief, defendants concede that "[i]t is undisputed that Native American spiritual leaders disagree whether it is essential to use tobacco in the ceremonial pipe or in tobacco ties." Docket 176 at 4-6. Weber testified that "there are differing opinions out there from different medicine men" regarding the role of tobacco in Lakota religion. Tr. 577:21-22. Moreover, Weber testified that he knows that Brings Plenty believes that tobacco is an important and fundamental part of his religious beliefs. Tr. 588:5-11 (Weber has never spoken with Creek about his religious beliefs).

Defendants, however, contend that because some Lakota use red willow bark while others use a blend of red willow bark and tobacco, "Plaintiffs are not denied a meaningful opportunity to practice Lakota spirituality" because they

36

are allowed to use red willow bark in their pipe, tobacco tie, and prayer flag mixtures. Docket 176 at 21. Even if defendants are correct that red willow bark provides a way to practice Lakota spirituality, this is not the proper inquiry under RLUIPA. RLUIPA forbids the court from examining whether a professed religious belief is a central tenet to the religion. *See* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" as "*any* exercise of religion, *whether or not compelled by, or central to*, a system of belief") (emphasis added); *see also Van Wyhe*, 581 F.3d at 656 (reasoning that RLUIPA bars "inquiry into whether a particular belief or practice is central to a prisoner's religion") (citation omitted).

The fact that some Lakota use a blend of red willow bark and tobacco or only red willow bark is irrelevant because a religious practice does not need to be a universal practice for adherents of a particular faith. "Interfaith differences . . . are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences[.]" *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717 (1981) (finding that even under the less protective First Amendment free exercise doctrine, "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow workers more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). "[N]o 'doctrinal justification' is required to support the religious practice allegedly infringed." *Gladson*, 551 F.3d at 833. An inmate's beliefs need "not fit squarely

37

with the orthodoxy" of an established religion to be entitled to protection. *Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000) (citing *Thomas*, 450 U.S. at 715-16).

Interfaith differences in the Lakota religion are especially common due to the Lakota religion's oral tradition. All of the traditional healers testified, and defendants agree, that there are interfaith differences in the Lakota religion. Additionally, if RLUIPA forbids the court from examining whether a professed religious belief is a central tenet to the religion, 42 U.S.C. § 2000cc-5(7)(A), it certainly prohibits defendants from dictating that plaintiffs will use red willow bark in their religious ceremonies when plaintiffs have testified that tobacco is an essential and fundamental part of practicing their Lakota religion.

Defendants also dispute the sincerity of plaintiffs' beliefs. Defendants argue that because plaintiffs have disciplinary records for tobacco violations and have attended services at the Native American church or Christian services, there is a factual basis for the court to conclude that plaintiffs' religious beliefs are not sincerely held. Sincerity of religious beliefs is a question of fact for the court. *Gladson*, 551 F.3d at 835.

Creek has been incarcerated since 1990 and has had 4 tobacco violations, including one violation when he opened up his tobacco and red willow bark mixture to allow another Native American inmate to fill his pipe. Creek testified that the tobacco in the violations came from other sources, not from the tobacco used in religious ceremonies. Brings Plenty has been

38

incarcerated since 1988 and has had 2 tobacco violations. The fact that Creek and Brings Plenty have had a combined number of 6 tobacco violations in a combined number of 55 years of incarceration does not mean that they do not sincerely hold their religious beliefs, especially because defendants have offered no evidence to dispute plaintiffs' testimony that the tobacco involved in those violations did not come from their religious ceremonies.[26]

After a discussion with Montoya, Brings Plenty attended Native American Church meetings to police the use of lighters. Creek attended one service at the Native American Church after another inmate invited him to go. Neither Creek nor Brings Plenty adhere to the Native American Church's tenets. The fact that Creek and Brings Plenty have explored other avenues of faith does not mean that they do not sincerely hold their religious beliefs. Under defendants' theory, if an inmate attended one service at another place of faith, he would be unable to assert that he sincerely holds his religious beliefs. Defendants would effectively prohibit inmates from exploring other faiths, even though Congress clearly indicated its intent that inmates should be encouraged to practice their religion (and thereby grow in faith) by passing RLUIPA. Defendants cite no precedent in support of this argument, and the court finds this argument

---

[26] While Brings Plenty was once caught with a screen and tobacco, Ex. 117, this presents only circumstantial evidence that one time Brings Plenty may have used a screen to separate tobacco from the mixture used in religious ceremonies. One tobacco violation involving tobacco from Native American ceremonies does mean that Brings Plenty does not sincerely hold his religious beliefs.

unpersuasive. Plaintiffs have shown that the use of tobacco in the pipe, tobacco ties, and prayer flags is religious exercise protected by RLUIPA.

### B.   Substantial Burden

Plaintiffs must also show that the tobacco ban was a substantial burden on the exercise of their religious beliefs. *Patel*, 515 F.3d at 814; 42 U.S.C. § 2000cc-2(b). Because tobacco is an essential and fundamental part of plaintiffs' religious exercise, a total ban on tobacco is "a substantial burden on the religious exercise of a person residing in or confined to an institution[.]" 42 U.S.C. § 2000cc(a).

Defendants contend that the Eighth Circuit has upheld a prison's decision to limit tobacco to Native American inmates in *Runningbird v. Weber*, 198 Fed. App'x 576 (8th Cir. 2006). In *Runningbird*, a Native American inmate brought a § 1983 claim against prison officials for "restrictions which were placed on the tobacco and sweat-lodge ceremonies in the penitentiary," and the Eighth Circuit found in favor of the defendants. *Id.* at 577. *Runningbird*, however, involved *limits* on tobacco, not a *ban* on tobacco. Thus, it does not support defendants' assertion that they have not substantially burdened plaintiffs' religious exercise by banning *all* tobacco.[27]

_____

[27] Defendants also rely on *Farrow v. Stanley*, No. 02-567, 2005 WL 2671541 (D.N.H. Oct. 20, 2005) for the proposition that "a New Hampshire district court held that allowing [kinnikinnick], a tobacco alternative, does not substantially burden the religious exercise of a practicing member of the Lakota Sioux Nation." Docket 176 at 19. But that facility's policy did "not prohibit inmates from using [kinnikinnick] with some tobacco in it." *Farrow*,

Defendants further argue that "[w]hen the evidence supports the use of 99% *cansasa* and 1% tobacco, the Court can reasonably conclude that the burden is not substantial." Docket 176 at 21-22. But the amount of tobacco present in the tobacco and red willow bark mixture is not at issue in this case. Plaintiffs do not contend that they require a certain amount of tobacco in order to practice their religion. Small amounts of tobacco are frequently utilized as offerings in the Lakota religion. For example, a pinch of tobacco is often thrown into the fire at the beginning of a ceremony.

Throughout the years, the DOC has decreased the amount of tobacco in the tobacco and red willow bark mixture and decreased the amount of mixture that plaintiffs may use during their ceremonies. Plaintiffs accepted these policy changes. Plaintiffs testified that Moves Camp correctly summarized their religious beliefs, and Moves Camp testified that the tobacco could be 5 percent or even 1 percent of the mixture. It is not the amount of tobacco, but rather the fact that tobacco is present in the ceremonies, that is important.

One could argue that the lack of change in attendance numbers at sweat lodge ceremonies after the ban is indicative that a substantial burden does not

---

2005 WL 2671541, at *5 (citation to transcript omitted). Because defendants have prohibited *all* tobacco, *Farrow* is unpersuasive. Defendants further rely on *Adams v. Mosley*, No. 2:05-cv-352, 2008 WL 4369246 (M.D. Ala. Jan. 7, 2008). Because the plaintiff in *Adams* provided no evidence on the importance of tobacco in his religious ceremonies, the court found that defendants did not violate RLUIPA. *Id.* at *11-12. Plaintiffs have presented extensive evidence on the importance of tobacco to their religious beliefs.

exist. This argument, however, is not persuasive. As Moves Camp noted in his testimony, tobacco to the Lakota is like the Bible to Christians. In keeping with this analogy,[28] Christians would still likely attend church and other religious ceremonies even if the Bible was removed from the proceedings. But it is equally as likely that Christians would find their ability to practice Christianity substantially burdened by their inability to rely on the Bible during such ceremonies.[29] Turning back to the case at hand, the fact that attendance at sweat lodge ceremonies has not changed after the ban does not prove that tobacco is unnecessary to practice the Lakota religion; it simply shows that the sweat lodge ceremonies still play an important role in the lives of the inmates attending such ceremonies, despite the lack of tobacco. Thus, plaintiffs have met their burden in showing that the complete tobacco ban is a substantial burden on their religious exercise.

## II.    Compelling Governmental Interest

Because plaintiffs have met their threshold showing that defendants have substantially burdened their religious exercise, defendants bear the burden to show that the tobacco ban was in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-2(b); 42 U.S.C. § 2000cc-

---

[28] Although the analogy is not perfect, it is helpful.

[29] Bible verses are often read during Christian ceremonies.

42

1(a)(1), (2). "The Supreme Court has remarked that 'context matters' in the applications of [the] 'compelling governmental interest' standard, and that RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.' " *Fegans v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)). In passing RLUIPA, Congress was "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Cutter*, 544 U.S. at 723. Courts should apply RLUIPA with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Id.* (citation to RLUIPA's legislative history omitted).

Because context matters, the court must review the alleged compelling government interest with reference to the particular individuals and circumstances at issue; religious rights cannot be substantially burdened out of a desire to enforce a general policy. 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person . . . confined to an institution . . . even if the burden results from a rule of general applicability[.]"). Under RLUIPA, " 'no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison.' " *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008)

43

(quoting *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 989 (9th Cir. 2008)); *see also Spratt v. Rhode Island Dep't of Corr.*, 482 F.3d 33, 39 (1st Cir. 2007) ("[M]erely stating a compelling interest does not satisfy the [State's] burden on this element of RLUIPA.").

The alleged security concerns must be "grounded on more than mere speculation, exaggerated fears, or post-hoc rationalizations." *Fowler v. Crawford*, 534 F.3d 931, 939 (8th Cir. 2008) (quotation omitted). Defendants "must do more than merely assert a security concern . . . they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.' " *Murphy*, 372 F.3d at 988-89 (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1554 (8th Cir. 1996)). Courts need not defer to a judgment about prison security if there is "*substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations[.]" *Fegans*, 537 F.3d at 902 (explaining the development of this standard).

Because post-hoc rationalizations provide an insufficient basis to find a compelling governmental interest, the court must look to the compelling interest asserted by defendants at the time of the ban. There are only two contemporaneous written documents about the DOC's decision to ban tobacco: Weber's letter dated October 19, 2009, addressed to "Tribal Liaisons, Spiritual Leaders, Pipe Carriers, and Sundancers, (Ex. 103) and Wagner's email dated October 19, 2009, to various DOC officials.  (Ex. 108).

The majority of the two contemporaneous documents states that defendants banned tobacco because they believed that tobacco is not traditional in Lakota religious ceremonies. In Weber's letter, he stated that the

> Medicine Men and Spiritual Leaders, who lead ceremonies at our facilities, have brought to our attention that tobacco is not traditional to the Lakota/Dakota ceremonies . . . . They have requested that tobacco be removed from Native American Ceremonies[.]. . . Effective 10/19/09, the SDDOC will follow the advice of the respected Medicine Men and Spiritual Leaders and remove tobacco from Native American Ceremonies.

Ex. 103.  And Wagner's email listed religious, not security, reasons for banning tobacco:

> [T]obacco is being removed from all Native American Ceremonies per the request of Medicine Men who lead ceremonies at our facilities. . . . When inmates come to you to complain, *please remind them that we are honoring the request of the respected Medicine Men and are going back to their traditional ways.*

Ex. 108 (emphasis added). Defendants primarily framed the ban as the DOC's efforts to accommodate the spiritual leaders' requests.

The portion of the contemporaneous written documents that does address security concerns is limited to two out of five paragraphs of Weber's letter where he describes the abuse of tobacco by inmates. His letter states that "[m]any inmates have been caught separating the tobacco from their tie and pipe mixtures. This tobacco is then sold or bartered to other inmates." Ex. 103. Weber's letter also stated that prison gangs pressure inmates to sell their tobacco instead of using it for spiritual reasons. Ex. 103.

45

To support their contention that security reasons justified the ban, during the trial defendants offered a disciplinary report showing that Brings Plenty had been caught one time with a screen that had tobacco residue on it. Ex. 117. Wagner also testified that she saw tobacco-related disciplinary reports during the time period in which DOC permitted inmates to use tobacco in religious ceremonies. Tr. 236:2-14 (describing an incident involving Marcel Boyd, a former NACT president who is not a named plaintiff in this action).[30]

Defendants also offered the testimony of Lake, who stated that he saw violence involving tobacco and he felt threatened by other inmates due to his access to tobacco in religious ceremonies. But Creek and Brings Plenty, who have been incarcerated for longer than Lake, testified that they have not been subject to threats from other inmates. The DOC presented no other evidence that tobacco from Native American religious ceremonies created a security or safety risk. And Weber was unable to provide any evidence of how many tobacco-related offenses occurred before and after the ban.

The remainder of the evidence offered by defendants consists of opinions and beliefs by defendants that were developed *after* they banned tobacco. There is no other contemporaneous evidence to support a decision to ban all tobacco.

---

[30] During trial, the court received Exhibit 146, which contains a list of 33 tobacco-related violations for NACT members during a 13-month time period. Ex. 146. Defendants offered no evidence that these 33 violations posed any security risk. Moreover, defendants did not offer a similar report for the time period after the tobacco ban took effect, which makes it impossible for the court to determine whether the ban eliminated the violations.

Defendants assert that they do not need to provide the documentation, and they are entitled to deference in determining that safety concerns justify the tobacco ban. Docket 176 at 26 ("The mandate that the Court offer deference to the judgment and consideration of prison officials does not require this sort of proof."). But RLUIPA requires defendants to offer more than conclusory statements for their alleged security concern. *Murphy*, 372 F.3d at 988-89.

Defendants began a renewed investigation into tobacco use in Native American religious ceremonies after a September 2009 meeting with Has No Horses.  Defendants then met with Stone and drafted a letter supporting the ban for him to sign and they solicited a statement from Johnston. Two Dogs then drafted a letter to defendants supporting the ban.  Defendants did not consult with Creek, Brings Plenty, or any other member of NACT before completely banning tobacco to ascertain the scope of plaintiffs' religious beliefs.

Based on the timing of the tobacco ban, which occurred shortly after the meeting with Has No Horses, the court finds that the ban was implemented to effectuate what defendants believed was the advice of the medicine men and spiritual leaders regarding the Lakota religion rather than due to security reasons.  Defendants essentially enforced what they determined to be the more "traditional" Lakota belief. But the state may not determine what is "traditional" or "orthodox" within a certain religious tradition. *See, e.g.*,

*Grayson v. Schuler*, 666 F.3d 450, 453-55 (7th Cir. 2012) ("Prison [officials] may not determine which religious observances are permissible because [they are or are not] orthodox."). After considering the evidence presented to the court, the court finds that defendants have not shown a compelling governmental interest in banning all tobacco.

## III. Existence of Less Restrictive Means

Even if defendants had a compelling governmental interest, defendants must also prove that they chose the least restrictive means possible to further that interest. 42 U.S.C. § 2000cc-1(a)(2). Prison officials must seriously consider other alternatives before implementing their chosen policy. *Murphy*, 372 F.3d at 989 (reasoning that the Eighth Circuit "require[s] some evidence that [the DOC's] decision was the least restrictive means necessary to preserve its security interest." (citing 42 U.S.C. § 2000cc-1(a)(2))); *see also Alvarez*, 518 F.3d at 1156 ("Under RLUIPA, prison officials bear the burden of establishing that the restriction challenged is the least restrictive alternative to achieve a compelling governmental interest." (citation omitted)). Because defendants did not discuss their plans to ban tobacco with plaintiffs before implementing the ban, they were unable to formulate any less restrictive means with plaintiffs.

Brings Plenty and Creek both testified that it would be acceptable if only pipe-carriers and fire-keepers or outside volunteers were responsible for making tobacco ties and prayer flags. Weber admitted that limiting the number

48

of inmates who may make tobacco ties could control the unauthorized use of tobacco.

Plaintiffs and Moves Camp agreed that it would be acceptable if staff or volunteers transported tobacco ties, prayer flags, and the pipe mixture directly to the site of the religious ceremonies. Plaintiffs agree with Moves Camp that the amount of tobacco in the tobacco and red willow bark mixture could be reduced to 5 or 10 percent tobacco. Plaintiffs believe that more restrictive security measures could also be used, such as cell restrictions, disciplinary segregation, or administrative segregation if an inmate violates the tobacco policy. The facilities' dogs, which are trained to search for tobacco, could be used when inmates leave the tobacco tie room or any other ceremony where the tobacco mixture is allowed.

Plaintiffs also suggest that defendants allow tobacco for religious purposes at the lower-level security DOC facilities but not at higher-level security facilities such as the Jameson Annex. Defendants could also consider allowing tobacco only during certain ceremonies, such as the sweat lodge ceremonies, because Weber testified that there have been no security problems at sweat lodge ceremonies in 31 years. Tr. 533:3-9. Defendants could also consider allowing fewer Lakota ceremonies to be conducted with the tobacco mixture, which would provide defendants greater opportunity to supervise ceremonies.

49

Defendants argue that Weber addressed all of plaintiffs' suggested alternatives "at trial in his testimony." Docket 176 at 32. But defendants offered *no evidence* that defendants considered *any* of plaintiffs' proposed alternatives before banning all tobacco. While defendants need not "refute every conceivable option in order to satisfy the least restrictive means prong," they must offer some evidence that they considered other alternatives before implementing a policy that substantially burdens plaintiffs' religious beliefs. *Fowler*, 534 F.3d at 940 (quotation omitted). Defendants adjusted the amount of tobacco in the mixture and instituted other limitations throughout the years. But after the 2005 decision to reduce the amount of tobacco in the mixture from 50 percent tobacco to 25 percent tobacco, defendants did not offer evidence of other plans to control the alleged tobacco abuse.

Defendants, citing *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), contend that the court must defer to their determination that there are no less restrictive means. In *Fowler*, the court reasoned that because it was "presented only with disputes regarding professional judgment, 'our inferences must accord deference to the views of prison authorities' where those views rest on more than mere speculation and conjecture." *Id.* at 943 (quoting *Beard v. Banks*, 548 U.S. 521 (2006)). But *Fowler* concerned a summary judgment motion where the plaintiff failed to "set forth specific facts showing a genuine issue for trial." *Id.* at 940 (citing Fed. R. Civ. P. 56(e)(2)). Moreover, the plaintiff

50

in *Fowler* refused the alternatives proposed by the prison officials. *Id.* at 939-40
("The record before us plainly reveals that JCCC officials suggested alternatives
to and sought a compromise with Fowler, to no avail.").

Here, defendants never suggested any alternative to plaintiffs. Instead,
defendants met with a few spiritual leaders, one of whom, Has No Horses, they
misunderstood, and declared to plaintiffs that they were returning inmates to
their traditional ways at the request of the medicine men. *Fowler*'s holding is
inapplicable to the facts in this case.

Weber testified that he had tried "everything he could think of" before
banning tobacco. Tr. 590. Wagner researched other institutions' policies and
found that North Dakota and Nebraska are tobacco-free. It appears that she
also reviewed Minnesota's written policy, which allows tobacco if certain
conditions are met. Exs. 1, 2, and 3. Defendants did not provide any other
evidence of research into less restrictive means before or during the trial. In
response to the United States' statement of interest, however, defendants
provided copies of prison policies regarding tobacco from Wyoming, New
Hampshire, Nebraska, and Idaho. Docket 185-1. There is no indication,
however, that defendants consulted with Wyoming, New Hampshire, or Idaho
before banning all tobacco.

Defendants, citing *Brunskill v. Boyd*, 141 Fed. App'x 771 (11th Cir.
2005); *Smith v. Beauclair*, No. Cv-03-333, 2006 WL 2348073 (D. Idaho Aug. 11,

2006); *Roles v. Townsend*, 64 P.3d 338 (Idaho Ct. App. 2003), argue that "[o]ther courts have agreed that a tobacco ban is the least restrictive means for addressing the safety and security concerns regarding tobacco in prisons." Docket 176 at 29.

In *Roles*, an inmate alleged that the state prison's policy to ban all tobacco violated Idaho's Free Exercise of Religion Act. 64 P.3d at 338-39. The court found that the state had shown a compelling governmental interest in banning tobacco because it promoted "public health, provide[d] an environment free from second-hand smoke, [r]educed litigation related to second-hand smoke, protecte[d] buildings against property damage, and curtail[ed] rising medical costs." *Id.* at 339.

*Roles* is unpersuasive because the inmate did not allege a RLUIPA violation, and it was unclear how much tobacco the inmate requested be present in his smoking mixture. Here, Moves Camp testified that 1 to 10 percent tobacco would be a sufficient amount to allow plaintiffs to exercise their religious beliefs. Moreover, defendants have not alleged medical reasons for banning tobacco.

In *Smith v. Beauclair*, the inmate requested permission to smudge a mixture of botanicals and tobacco in his cell and smoke tobacco in his cell. *Id.* at *3-4. The inmate's professed religious beliefs were wholly different from the other Native American inmates. *Id.* The court found that "Defendants have met

52

their burden of showing the legitimate penological reason for burdening Plaintiff's request to smoke and burn tobacco *in his cell.*" *Id.* at *9 (emphasis added) ("[E]ven under the stricter standard of RLUIPA, smoking and burning tobacco in an inmate's cell will not be accommodated.").

Here, plaintiffs do not seek to either hold, smoke, or otherwise use tobacco in their cells. Instead, plaintiffs seek to use tobacco in their pipe mixture, tobacco ties, and prayer flags during certain ceremonies at a different location in the prison. It appears that all burning of tobacco will be conducted outside in the sweat lodge when the pipe is smoked or the tobacco ties or prayer flags are burned. If a pipe ceremony separate from a sweat lodge ceremony is held, it could also be held outside to reduce the risk of exposure to second-hand smoke and protect buildings from property damage. Thus, *Smith* is unpersuasive.

In *Brunskill*, the inmate's request for permission to possess certain religious materials, including tobacco, was denied, and he brought a lawsuit against the prison alleging, in part, an RLUIPA claim. 141 Fed. App'x at 773. Because the defendants offered other alternatives (not specified in the case), the court found that the inmate could not show that the defendants had substantially burdened the exercise of his religion. *Id.* at 776. *Brunskill* is unpersuasive because the inmate sought possession of tobacco in his cell. As stated above, plaintiffs do not seek possession of tobacco in their cells.

Due to the differences in the cases cited by defendants, the court does not agree with defendants' statement that "[o]ther courts have agreed that a tobacco ban is the least restrictive means for addressing the safety and security concerns regarding tobacco in prisons." Docket 176 at 29.

Furthermore, the evidence of what other prisons have done to accommodate inmates' religious practices does not support defendants' decision to ban all tobacco. *See Fowler*, 534 F.3d at 942 (reasoning that other prisons' actions are relevant although not controlling as to what prison officials should do in their own institutions). While some state prison systems have completely banned tobacco, the Federal Bureau of Prisons (BOP) provides that its facilities should determine ""[i]ndoor and outdoor areas authorized and designated for the ritual use of tobacco; and [w]here applicable, procedures for procuring, storing, and using tobacco for rituals." Docket 173-1, Bureau of Prisons, *Program Statement: Religious Beliefs and Practices, Statement P5350.099*, at ¶ 20(i)-(j) (2004).[31] In the RLUIPA context, the BOP's ability to

---

[31] Defendants contend that the court should not take judicial notice of the BOP policy (even though they submitted four state prison policy statements) because there is no evidence of a particular policy at any federal institution in the record and, if the policy was relevant, plaintiffs should have offered it at trial. Docket 176 at 39-40. If a fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[,]" then the court can take judicial notice of the fact. Fed. R. Evid. 201(b)(2). The policy was passed pursuant to 28 C.F.R. § 548.10-20 and 28 C.F.R. § 540.48. Docket 173-1 at 3. The policy is available online from the BOP's website. *See* http://www.bop.gov/policy/progstat/5360_009.pdf. (last visited September 19, 2012). Thus, the policy's accuracy can be readily determined. BOP's policy is relevant because it states that every institution should create a plan for

accommodate religious exercise with less restrictive alternatives provides evidence of the feasibility of such measures in state prison systems. *See, e.g.*, *Spratt*, 482 F.3d at 42 (acknowledging that prison facilities differ but reasoning that "in the absence of any explanation by [the state department of corrections] of significant differences between [the state facility] and a federal prison that would render the federal policy unworkable, the Federal Bureau of Prisons policy suggests that some form of inmate preaching could be permissible without disturbing prison security.").

Multiple state prisons allow their inmates to use tobacco for religious purposes. *See, e.g.*, *Fowler*, 534 F.3d at 933 (noting that practitioners of Native American faith at Jefferson City Correctional Center, a maximum security prison, are permitted to possess a "sacred bundle" consisting of "a prayer pipe, sage, cedar, sweet grass, tobacco, a medicine bag, and prayer feathers"); *Thunderhorse v. Pierce*, 364 Fed. Appx. 141, 147-48 n.5 (5th Cir. 2010) (per curium) (upholding ban on pipe use in cells but noting that the facility allowed the use of pipes in outdoor ceremonies); *Caldwell v. Folino*, No. 2:08-cv-00122, 2011 WL 4899964, at *8-9 (W.D. Pa. Oct. 14, 2011) (noting that Pennsylvania Department of Corrections allows Native American inmates to have a pinch of tobacco in their medicine bags); *Delgado v. Ballard*, No. 2:09-cv-01252, 2011

───────────────

handling tobacco used in religious ceremonies, meaning that the BOP has not outlawed tobacco in every institution. Accordingly, the court takes judicial notice of Docket 173-1. Even if the court did not take judicial notice of BOP's policy, the court would reach the same outcome in this case.

WL 7277826, at *8-9 (S.D. W. Va. Oct. 6, 2011) (reasoning that the prison's "Operational Procedure permits the plaintiff to smoke a tobacco mixture in a prayer service[.]"); *Hopson v. TDCJ-CID*, No. 6:09-v-506, 2011 WL 4554379, at *2-3 (E.D. Tex. Sept. 29, 2011) (noting that the facility's policies only prohibited possession of religious tobacco in inmates' cells)*; Newberg v. Geo Group, Inc.*, No. 2:09-cv-625, 2011 WL 2533804, at *4-5 (M.D. Fla. June 27, 2011) (holding that "Plaintiff's claims are moot due to the implementation of a new . . . policy permitting Native American residents to smoke tobacco, smudge, and perform other Native American rites and ceremonies[.]"); *Taylor v. Hubbard*, No. 1:10-cv-00404, 2010 WL 3033773, at *1-2 (E.D. Cal. July 30, 2010) (explaining that inmate was permitted tobacco during ceremonies but not in cell); *Vega v. Rell*, No. 3:09-cv-737, 2011 WL 2471295, at *3 (D. Conn. June 21, 2011) (noting that Native American prisoners "can burn tobacco"); *Bostwick v. Oregon Dep't of Corrections*, No. 09-657, 2011 WL 1261168, at *2 (D. Or. Mar. 31, 2011) (noting that "inmates are not permitted to have tobacco in their cells because the inmate could use it himself or sell it to other inmates, and because it presents a fire hazard. Religious volunteers do bring tobacco for use during ceremonies where the volunteer supervises its use[.]"); *Bailey v. Rubenstein*, No. 2:08-cv-01204, 2009 WL 1024614, at *2 (S.D. W. Va. Apr. 15, 2009) (reasoning that because the facility permitted Native American inmates "to smoke in religious ceremonies despite the generally applicable tobacco ban," plaintiff's rights

under RLUIPA were not substantially harmed); *Skenandore v. Endicott*, No. 05-C-0234, 2006 WL 2587545, at *13 (E.D. Wis. Sept. 26, 2006) (upholding restrictions where inmates were not permitted to smoke tobacco in their cells but could do so in religious ceremonies outside of their cells ).

While " 'evidence of policies at one prison is not conclusive proof that the same policies would work at another institution,' " *Fowler*, 534 F.3d at 941 (quoting *Spratt*, 482 F.3d at 42), it is clear that federal and multiple state correctional institutions allow some use of tobacco by Native American inmates in their religious ceremonies. This widespread allowance of tobacco in prisons lends substantial credence to plaintiffs' position that less restrictive alternatives to a complete ban on the use of tobacco in Lakota religious ceremonies is possible. Given these cases and defendants' lack of evidence supporting their position, defendants have not met their burden of proof that they implemented the least restrictive means to further a compelling interest.

## IV. Injunctive Relief

As relief, plaintiffs seek to reinstate the tobacco policy that was in effect before the tobacco ban, which allowed inmates who practice the Native American religion to have one-eighth cup of a mixture of 25 percent tobacco and 75 percent red willow bark. Defendants contend that plaintiffs are not entitled to injunctive relief under the Prison Litigation Reform Act (PLRA). The PLRA provides that "[p]rospective relief in any civil action with respect to prison

conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1).

Even though defendants violated plaintiffs' federal rights under RLUIPA, the PLRA states that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626. Due to defendants' professed security concerns, even if they were post hoc rationalizations for banning all tobacco, reinstating the DOC's policy regarding tobacco that was in effect before the ban is not the most narrowly tailored plan.

In the event that the court does not reinstate the policy that was in effect before the ban, plaintiffs suggest that the court direct the parties to propose an order. Thus, the parties are ordered to meet and confer and propose to the court the terms of a narrowly tailored injunction.

## CONCLUSION

The court conducted a court trial on plaintiffs' RLUIPA claim. After hearing all of the evidence, the court finds that plaintiffs have met their threshold burden to show that defendants' decision to ban all tobacco substantially burdens their religious exercise. Defendants have not met their burden to prove that they had a compelling governmental interest for banning

58

all tobacco. Even if defendants had asserted a compelling governmental interest, they have not proven that the complete ban was the least restrictive means available to further that governmental interest. Thus, defendants violated RLUIPA by banning all tobacco. The parties should meet and propose an appropriate, narrowly tailored injunction, which should include revisions to the tobacco policy for inmates practicing the Lakota religion. Accordingly, it is

ORDERED that the parties will meet and confer about the terms of a narrowly tailored tobacco policy and inform the court about their progress toward that settlement by **November 13, 2012**. If the parties fail to reach an agreement of the terms of an injunction by **November 13, 2012**, the parties will each submit their proposal to the court by **November 20, 2012.**  The parties will then have until **December 4, 2012**, to file any objections to the proposal of the opposing party.

Dated September 19, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE